IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JEFFREY S. MORRILL,

      Plaintiff,

v.                                                    CASE NO. 5:15-cv-324-WTH-GRJ

HOLMES COUNTY JAIL, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

      This matter is before the Court on ECF No. 102, Defendant Doctors

Memorial Hospital's Motion for Summary Judgment, ECF No. 104,

Defendant Tim Brown's Motion for Summary Judgment, ECF No. 105,

Defendant Lynn Lee's Motion for Summary Judgment, ECF No. 106,

Defendant Raina Brown's Motion for Summary Judgment, and ECF No.

107, Defendant Holmes County, Florida's Motion for Summary Judgment.[1]

Plaintiff has filed responses in opposition to each motion for summary

judgment. (ECF Nos. 115–19.) Defendant Doctor Memorial Hospital also

_____

[1] Defendants Raina Brown, Tim Brown, and Lynn Lee also filed a joint
memorandum in support of their individual motions for summary judgment. (ECF No.
110.) Similarly, Defendant Holmes County, Florida filed a notice of supplemental
authority in support of its motion for summary judgment. (ECF No. 122.)

filed a reply to Plaintiff's response in opposition. (ECF No. 120.)[2] The

motions for summary judgment are therefore ripe for review. For the

reasons discussed below, it is respectfully recommended that the motions

for summary judgment should be granted.

## I.  BACKGROUND

Plaintiff, an inmate in the custody of the Florida Department of

Corrections ("FDOC"), initiated this case by filing a *pro se* complaint under

42 U.S.C. § 1983. Plaintiff therafter amended his complaint, rendering the

second amended complaint, ECF No. 24, the operative complaint in this

matter. The second amended complaint ("Complaint")  concerns two

issues: (1) the mental healthcare, or lack thereof, Plaintiff received while he

was in custody at the Holmes County Jail ("HCJ"); and (2) punishment

Plaintiff endured while in custody at HCJ. (ECF No. 24 ("Compl.").) Plaintiff

alleges, generally, that Defendants were deliberately indifferent to his

serious medical needs, denied Plaintiff due process, and committed

various state law torts. As relief, Plaintiff seeks declaratory relief and

compensatory and punitive damages.

This case is relatively straightforward and is, in essence, about a pre-

---

[2] The other four Defendants did not file replies and the time for doing so has expired.

trial detainee/convicted inmate who was appropriately monitored by the HCJ, placed on suicide-watch in a suicide-watch cell under appropriate circumstances, appropriately treated by Doctors Memorial Hospital ("DMH"), who now complains that his attempted suicides during two jail escapes are somehow the fault of the HCJ and DMH. Despite Plaintiff's attempt to hold multiple entities and individual Defendants responsible for his unfortunate self-harm tendencies the undisputed evidence demonstrates that Defendants are entitled to summary judgment.

## II. EVIDENCE

Plaintiff was arrested on October 16, 2013, for trafficking in methamphetamine and grand theft and confined to the HCJ pending trial. (ECF No. 102-5, 11:7–9 ("Pl. Dep.");  ECF No. 103-1 at 8.) Although Plaintiff now admits he had attempted suicide on numerous occasions prior to October 16, 2013, during booking he affirmatively stated he had never attempted to harm himself. (Pl. Dep. 63:1–65:21; ECF No. 103-1 at 2.) He did represent however, that his current state of mind was "down," and that he suffered from mental illness, so he was placed in the suicide-watch cell. (Pl. Dep. 14:19–15:9; ECF No. 103-1.) He was then released on bond on December 2, 2013. (ECF No. 103-1 at 8; Pl. Dep. 11:12–14.)

Plaintiff was arrested on unrelated charges on December 12, 2013.

(Pl. Dep. 11:13–12:10.) He was again booked into HCJ, at which time he told jail officials that he was not suicidal, had never attempted suicide, did not have any special health problems, was not on any current medications, and did not have any problems HCJ needed to know about. (ECF No. 103-1 at 13–16.) He was released on bond the following day. (*Id.* at 20; Pl. Dep. 12:3–10.)

As a result of Plaintiff's December 12, 2013 arrest and charges, the court revoked Plaintiff's bond on the charges of trafficking in methamphetamine and grand theft. (Pl. Dep. 12:7–10; ECF No. 103-2 at 10.) Plaintiff was then arrested and booked back into the HCJ on January 15, 2014. (Pl. Dep. 12:7–10; ECF No. 103-2 at 10.) Plaintiff underwent a classification interview during the booking process, during which he again represented that he was not suicidal, had never attempted suicide, did not have any special health problems, was not on any current mental health medications, and did not have any problems HCJ needed to know about. (ECF No. 103-2 at 1–3.) From his incarceration on January 15, 2014, through May 2014, there were no incidents where Plaintiff attempted to hurt himself or attempted suicide. (Pl. Dep. 17:20–24.)

At the time, Raina Brown, RN ("Nurse Brown"), was the HCJ's only in-house medical provider and only worked part-time at the HCJ. (Compl.

at 7–8.) Plaintiff spoke with Nurse Brown for approximately twenty minutes on June 19, 2014, about being depressed because he lost custody of his daughter. (Pl. Dep. 23:11–20.) The HCJ's policies make provisions for providing mental health services to detainees. (ECF No. 102-1.) For example, mental health professionals go to HCJ to hold anger management classes and meet with detainees for various mental health issues. (Pl. Dep. 23:11–20.) Plaintiff asked Nurse Brown if he could meet with one of the mental health professionals. (*Id.*) Nurse Brown told Plaintiff she would set up an appointment for Plaintiff to see a mental health professional. (*Id.*) Nurse Brown informed Plaintiff, however, that the jail does not provide mental health medications to detainees unless they were receiving the medications prior to custody. (Compl. at 8.) Plaintiff admits he never told Nurse Brown or any other HCJ officials about his suicidal feelings. (Pl. Dep. 69:12–19.) He also admits he has a habit of not telling people he is suicidal. (*Id.* at 68:6–8.)

On or about June 19, 2014, Plaintiff started a verbal altercation with a guard about missing lunch because Plaintiff was absent from the cell block at the time of feeding. (*Id.* at 20:3–14.) Plaintiff threatened the officer and was subsequently moved to an administrative cell. (*Id.*) Sometime that evening, Plaintiff used a contraband razor blade to cut his arm. (*Id.* at

20:16–21:2.) At approximately 10:50 p.m., an officer found Plaintiff on the floor of the cell with the wound to his arm. (*Id.* at 22:10–13; ECF No. 103-4 at 3 ("IR-1").) The officer called and Defendant Lynn Lee, Holmes County Jail Administrator ("Lieutenant Lee"), who told the officer to call for emergency medical services ("EMS"). (Pl. Dep. 22:10–13; IR at 3.) The officer called dispatch to send EMS to the HCJ at approximately 11:00 p.m. (IR-1 at 3.)

Nurse Brown forwarded Plaintiff's medical information to the officer as soon as she learned of the incident so that the information could be provided to the hospital. (*Id.*) EMS arrived at approximately 11:22 p.m. and transported Plaintiff to Doctors Memorial Hospital ("DMH") via ambulance, accompanied by Lieutenant Lee and another officer. (*Id.*; Pl. Dep. 23:1–10.)

Plaintiff presented to DMH's emergency department at approximately 11:45 p.m. (ECF No. 102-4 ¶ 5 ("Welch Aff.").) Nursing staff triaged Plaintiff and then the emergency room physician, Dr. Leonel Welch, examined Plaintiff. (*Id.*) Dr. Welch performed a review of symptoms and physical evaluation of Plaintiff. (*Id.*) Dr. Welch determined that Plaintiff was suffering from hypothermia, leukocytosis, anemia, left arm laceration, and hypovolemia. (*Id.*; DMH MR at 3.) Dr. Welch approximated Plaintiff's

wound with ethylon, replaced Plaintiff's fluid volume via lactated ringers, and gave Plaintiff IV Rocephin, an antibiotic, a tetanus booster, and a ten-day prescription of Keflex, another antibiotic, to prevent future infection of the wound site. (Welch Aff. ¶ 6; DMH MR at 3.) Plaintiff thereafter received two units of blood transfused at a rate of one unit per two hours. (Welch Aff. ¶ 6; DMH MR at 3, 11.)

After more than eight hours of observation and treatment in the emergency department, Dr. Welch determined that Plaintiff could safely return to HCJ as long as he was placed on suicide precautions. (Welch Aff. ¶ 7.)  Dr. Welch noted in his discharge instructions that Plaintiff was to be placed on suicide precautions and that Plaintiff needed a follow-up evaluation within one to two days. (*Id.*; DMH MR at 4, 11, 13.) The discharge instructions were provided to the HCJ officials accompanying Plaintiff. (Welch Aff. ¶ 7; DMH MR at 11.) Dr. Welch's instruction to place Plaintiff on suicide precautions was to notify the HCJ that Plaintiff required whatever psychological protocols the HCJ has in place for detainees who have made suicidal gestures. (Welch Aff. ¶ 8.)[3]

---

[3] For example, Dr. Welch understood that the HCJ has protocols in place for providing psychological care to suicidal inmates, including placing that inmate in a suicide-watch cell, removing any items of clothing or property that might be used to inflict self-harm, and observing the detainee every fifteen minutes. (Welch Aff. ¶ 8.) Dr. Welch also understood that the jail contracts with Life Management Center to provide psychological evaluation and counseling when needed. (*Id.*)

Plaintiff was placed in the suicide-watch cell upon return to the HCJ. (Pl. Dep. 25:10–15.) The suicide-watch cell is composed of clear plexiglass material over bars so that officers can see inside the cell from the officers' station. (*Id.*) HCJ staff checked on Plaintiff in the suicide-watch cell every fifteen minutes. (*Id.*) Plaintiff remained in the suicide-watch cell for a week to two weeks. (*Id.* at 25:19–26:8.) He was released from the suicide-watch cell after Nurse Brown evaluated Plaintiff, during which time Plaintiff confirmed that he was "good." (*Id.* at 26:21–27:1.)

Plaintiff was convicted on charges of trafficking in methamphetamine and grand theft on June 25, 2014. (Compl. at 11.) On June 30, 2014, while being held at the HCJ pending sentencing, Plaintiff and another inmate attempted to escape by cutting a hole in the wall. (Pl. Dep. 28:7–12; ECF No. 103-7 ("IR-2").)  At approximately 2:00 a.m., upon realizing their escape attempt failed, Plaintiff attacked an officer with a makeshift weapon. (Pl. Dep. 54:12–15; IR-2.) The officer retreated to the officers' station, causing Plaintiff to start breaking the windows to the officers' station in an attempt to get the officer's keys. (Pl. Dep. 29:3–30:2; IR-2; ECF No. 103-8 ("Video-1").) Plaintiff was unsuccessful, however, and trapped in the hallway. (Pl. Dep. 30:1–2; IR-2; Video-1.) Plaintiff then tried to cut his wrists with a piece of the broken glass from the window. (Pl. Dep.

30:1–13.) Plaintiff admits that the glass did not cut very well because it was safety glass. (*Id.* at 33:4–6.)

Lieutenant Lee called the HCJ at approximately 2:18 a.m., advising that she was on her way to the HCJ. (IR-2.) Once officers were able to get into the hallway they secured Plaintiff and placed him in the suicide-watch cell. (Pl. Dep. 31:3–8; IR-2; Video-1.) Emergency personnel arrived at approximately 2:35 a.m, examined the cuts on Plaintiff's wrists, and left the HCJ at approximately 2:45 a.m. (IR-2; Pl. Dep. 31:8–14.) Lieutenant Lee and two other HCJ officers then transported Plaintiff to DMH for treatment at approximately 3:56 a.m. (*Id.*)

After being triaged at DMH, ARNP Dawn Frost ("Nurse Frost") performed a review of symptoms and evaluated Plaintiff. (ECF No. 102-2 ¶ 5 ("Frost Aff."); DMH MR at 2.) Plaintiff reported anxiety, a prior suicide attempt, and that he felt he had little to live for. (*Id.*) Nurse Frost learned that Plaintiff was on special precautions at the HCJ, which included frequent monitoring. (*Id.*) Physical examination revealed that Plaintiff was stable, with multiple minor lacerations on his upper extremities and neck that needed minimal treatment. (*Id.*) Nurse Frost treated Plaintiff's wounds with Betadine, and then applied Steri-Strips for wound closure, sterile tefla dressing, and an ace bandage. (Frost Aff. ¶ 6; DMH MR at 2.) The

scratches on Plaintiff's upper extremities and neck did not require sutures or any additional treatment. (*Id.*) Nurse Frost continued Plaintiff's antibiotic regiment for five days to prevent future infection. (*Id.*) The skin care regiment was reiterated to Plaintiff and provided in writing to the HCJ officials. (*Id.*) Based on her assessment of Plaintiff's medical and psychological condition, Nurse Frost did not believe that Plaintiff was a serious danger to himself or others and therefore determined that Plaintiff could return to the jail on special precautions. (Frost Aff. ¶ 8.) Prior to Plaintiff's discharge, Nurse Frost confirmed that Plaintiff would be placed on special precautions upon return to the HCJ. (*Id.*; DMH MR at 26.) Accordingly, Nurse Frost prepared a plan of care in writing for the HCJ and provided the discharge instructions to the HCJ officials. (DMH MR at 2, 26.)

Plaintiff was placed back into the suicide-watch cell upon return to the HCJ and checked on approximately every fifteen minutes by staff. (Pl. Dep. 34:4–9; IR-2 at 5.) He remained in the suicide-watch cell until July 23, 2014. (Pl. Dep. 34:10–25.) During that time, Plaintiff was not provided with a toothbrush and only temporarily given a tooth brush to brush his teeth on one occasion, not provided writing utensils, not allowed to shower or clean his room, and was placed on a special management meal, commonly

referred to as a "punishment loaf," which is the daily scheduled meal, blended, mixed with eggs, and flours, and baked into a loaf. (*Id.* at 40:17–41:22, 54:8–14; ECF No. 107-3 at 3.) Plaintiff does not know who issued the order to deny him showers, toothbrushes, writing supplies, and cleaner for his room. (Pl. Dep. 42:15–23.) Plaintiff believes, however, that Lieutenant Lee was the one who placed Plaintiff on special management meal because she is the jail administrator. (*Id.* at 42:7–14.)[4]

Plaintiff was sentenced to prison for trafficking in methamphetamine and grand theft on July 16, 2014. (Compl. at 14.) While still confined at the HCJ pending transfer to the Florida Department of Corrections ("FDOC"), Plaintiff managed to escape from the HCJ on July 23, 2014. (Pl. Dep. 34:10–36:14, 51:1–3; ECF No. 103-10 ("IR-3"); ECF No. 103-11 ("Video-2").) Plaintiff jimmied open the suicide-watch cell door while officers were tending to an inmate in the cell next to Plaintiff's cell, took the officers' keys hanging in the cell door next to Plaintiff's, locked the officers in the cell, and used the keys to escape from the HCJ. (Pl. Dep. 35:4–36:14; Video-2.) Plaintiff ran into the woods wearing only his suicide suit—a green suit held together by velcro—where he hid for approximately two hours covered in

---

[4] In her motion for summary judgment Lieutenant Lee concedes, for purposes of the motion, that she placed Plaintiff on punishment loaf but that she did not deny Plaintiff opportunities to shower, brush his teeth, or clean his cell. (ECF No. 105 at 25.) Lieutenant Lee has not submitted any evidence, however, to support this assertion.

thorn cuts, bruises, insect bites, and dirt until police apprehended and handcuffed him. (Pl. Dep. 36:14–37:25; IR-3; Compl. at 14.) Plaintiff then says he attempted to commit "suicide by cop," by asking police to shoot him. (Pl. Dep. 37:17–38:3.) Police did not shoot Plaintiff and returned him to HCJ, without further incident. (*Id.* at 38:12–18.)

Defendant Tim Brown, Holmes County Sheriff ("Sheriff Brown"), and Lieutenant Lee were at the HCJ when Plaintiff returned. (*Id.* at 38:18–20; Compl. at 14.) Plaintiff claims that although it was obvious he needed medical attention, Sheriff Brown told HCJ staff to shackle Plaintiff so Plaintiff could help them find the keys he used to escape. (Compl. at 14; Pl. Dep. 38:18–39:9.) Plaintiff says he was completely naked (without the suicide suit), shackled, and led around the facility for thirty to forty-five minutes, while they searched for the keys. (ECF No. 116 at 2.)[5] Afterwards, Plaintiff was placed in a holding cell without a mattress, clothing, or toilet paper, until the next morning when he was transported to state prison. (Pl. Dep. 39:17–40:3; Compl. at 15.)

---

[5] Plaintiff's response memoranda in opposition to Defendants' motions for summary judgment are signed under penalty of perjury. As such, the Court may consider the factual allegations asserted within the response memorandums when ruling on the motions for summary judgment. *See* 28 U.S.C. § 1746; *cf. Henderson v. Cherry*, No. 5:08cv283/RS/EMT, 2010 WL 1257487, at *1 n.2 (N.D. Fla. Mar. 16, 2010) (declining to consider plaintiff's response to defendant's motion for summary judgment as evidence because the response was not made under penalty of perjury).

Plaintiff was later charged and adjudicated guilty for five counts as a result of his first escape on June 30, 2014, including escape, conspiracy to escape, aggravated assault on a law enforcement officer, battery on a law enforcement officer, and criminal mischief. (ECF No. 103-9.) He was also charged and adjudicated guilty for one count of escape as a result of his second escape on July 23, 2014. (ECF No. 103-12.)

On December 2, 2015, while incarcerated by the FDOC at Suwannee Correctional Institution, Plaintiff mailed a letter to the Holmes County Sheriff's Office grieving issues that occurred while he was incarcerated at the HCJ. (ECF No. 116 at 12–14.)[6] These issues included: (1) Nurse Brown's failure to schedule an appointment for Plaintiff with a mental health professional; (2) DMH's failure to provide Plaintiff with mental healthcare or otherwise instruct the HCJ to obtain mental health treatment for Plaintiff; (3) DMH's failure to use stitches on Plaintiff's wounds; (4) Injuries Plaintiff sustained during the officer's use of physical force in apprehending Plaintiff in the woods upon his escape; (5) Sheriff Brown's and Lieutenant Lee's forcing Plaintiff to walk around naked outside looking for the keys; (6) Sheriff Brown's and Lieutenant Lee's failure to provide

---

[6] Although it is questionable whether this letter is admissible evidence under the Federal Rules of Evidence, none of the Defendants challenge the admissibility of the letter.

medical care to Plaintiff upon his return to the HCJ after apprehension; (7)

Lieutenant Lee's failure to provide Plaintiff with a disciplinary hearing

before placing him on punishment loaf and denying Plaintiff showers, cell

sanitation, and the ability to brush his teeth from June 30, 2014, through

July 24, 2014; and (8) the HCJ's policy of not providing mental health

medication if a person was not already receiving medication prior to arrest.

(*Id.*) Captain Tate responded to Plaintiff's grievance on January 4, 2016,

finding each of Plaintiff's complaints to be "unfounded." (*Id.* at 15–16.)[7]

Plaintiff has been detained in the HCJ four of five times. (Pl. Dep.

68:14–19.) He is aware of the HCJ's inmate written request forms, but

admits he probably never filled out a request form seeking mental health

treatment. (*Id.* at 69:2–11; ECF No. 103-13.) Although Plaintiff knew the jail

had a sick call, where inmates fill out a request to see the nurse, Plaintiff

never requested to see a nurse regarding his mental health. (Pl. Dep.

69:20–70:3.) Plaintiff also admits that he saw a doctor while incarcerated at

the HCJ, but never asked the doctor for mental health treatment. (*Id.* at

70:4–15.) Plaintiff never told Sheriff Brown he tried to harm himself and

does not know if Sheriff Brown knew that Plaintiff tried to harm himself. (*Id.*

---

[7] While it is also questionable whether Captain Tate's response is admissible evidence under the Federal Rules of Evidence, none of the Defendants challenge the admissibility of the response.

at 44:24–45:17.) In sum, Plainitff's conversation with Nurse Brown was the only time he sought mental health treatment while he was incarcerated at the HCJ. (*Id.* at 69:12–19.) Moreover, no medical professional has ever opined that Plaintiff needed either mental health treatment or prescription medication. (*Id.* at 26:3–6, 31:22–32:5.)

Plaintiff does not know whether the Holmes County Sheriff's Office or Holmes County entered into a contract with a *mental health* provider. (*Id.* at 80:2–5.) Further, DMH only provides *routine medical and emergency services* for detainees and inmates at the HCJ. (Welch Aff. ¶ 4.)[8] DMH is not licensed or equipped to provide psychiatric services. (*Id.*)

At some point prior to April 24, 2017, Plaintiff sent to Defendants all of the statutory pre-suit notice requirements pertaining to his medical malpractice claims against Nurse Brown and DMH, except for the expert opinion. (ECF No. 118 at 7.) Plaintiff is unable to access a medical expert because he is incarcerated. (*Id.*)

Frederick Epstein, M.D. ("Dr. Epstein"), a board certified physician in emergency medicine, thereafter reviewed Plaintiff's DMH medical records,

---

[8] Defendants marked a copy of a contact between DMH and Holmes County/Holmes County Sheriff's Department as a deposition exhibit. (Pl. Dep., Ex. 1.) The contract, however, pertains to the period of time from October 1, 2012, through September 30, 2013. (*Id.* at 1.) This period of time is irrelevant to this case and there is no evidence demonstrating that the contract was the same, or similar, during the period in question.

Plaintiff's notice of intent to sue, and Plaintiff's second amended complaint. (ECF No. 102-3, ¶¶ 1–3 ("Epstein Aff.").) Dr. Epstein opined that based upon his review of the records, together with his education, training, and experience as an emergency room physician, "there is no evidence of negligence on the part of the healthcare providers at Doctors Memorial Hospital which caused or contributed to any injury to Mr. Morrill." (*Id.* ¶ 4.) Dr. Epstein further opined that "it was reasonable and appropriate and well within the standard of care for emergency personnel for Mr. Morrill to be discharged back to the jail on both occasions after he was treated for his injuries." (*Id.* ¶ 5.)

## III.  STANDARD OF REVIEW

The entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988). But, "when opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (internal quotations and citations omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) (to defeat summary judgment "there must be evidence on which the jury could reasonably find for the plaintiff") "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988) ("The summary judgment standard requires that we resolve all reasonable doubts in favor of the non-moving party, but it does not require us to resolve all doubts in such a manner."). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986)).

The moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v.*

*Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party

may not simply rest on the pleadings, but must use affidavits, depositions,

answers to interrogatories, or other admissible evidence to demonstrate

that a material fact issue remains to be tried. *See Anderson,* 477 U.S. at

250; *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785–86 (11th Cir.

2005). Conclusory allegations based on subjective beliefs are insufficient

to create a genuine issue of material fact. *See, e.g., Waddell v. Valley*

*Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## IV.  DISCUSSION

### A.    Sheriff Brown and Lieutenant Lee's Motions for Summary Judgment (ECF Nos. 104–05)

Plaintiff claims Sheriff Brown and Lieutenant Lee were deliberately

indifferent to Plaintiff's serious medical and mental health needs, deprived

Plaintiff of basic human needs, and denied Plaintiff due process. More

specifically, Plaintiff claims Sheriff Brown and Lieutenant Lee failed to

provide Plaintiff with mental healthcare during the time he was incacerated

at the HCJ, denied Plaintiff medical care following his escape and capture

on July 23, 2014, and failed to provide Plaintiff with disciplinary reviews

prior to imposing punishment following his second suicide attempt. Plaintiff

further contends that these failures and denials amount to negligence and

intentional infliction of emotional distress ("IIED") under Florida law.

### 1. Exhaustion

Sheriff Brown and Lieutenant Lee argue that all of Plaintiff's claims against them should be dismissed because Plaintiff failed to exhaust administrative remedies prior to filing suit.

The PLRA requires a detainee or prisoner to exhaust all available administrative remedies before filing an action challenging prison or jail conditions. This requirement is a pre-condition to suit that courts must enforce even if the available administrative remedies are futile or inadequate. *McDaniel v. Crosby*, 194 F. App'x 610, 612–13 (11th Cir. 2006); *see also Goebert v. Lee Cty.*, 510 F.3d 1312, 1322–23 (11th Cir. 2007) (applying PLRA's exhaustion requirement to detainee in county jail). Exhaustion is mandatory under the PLRA, and unexhausted claims are not permitted. *Jones v. Bock,* 549 U.S. 199, 211 (2002).

The PLRA's exhaustion requirement contains a procedural default component; prisoners must comply with the applicable deadlines, or good-cause standards for failure to comply, contained in the administrative grievance procedures. *Johnson v. Meadows*, 418 F.3d 1152, 1158 (11th Cir. 2005). "'[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies, and thus is

foreclosed by § 1997e(a) from litigating." *Id.* (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024–25 (7th Cir. 2002)). "[T]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require.'" *Id.*; *see Bryant v. Rich*, 530 F.3d 1368, 1372 (11th Cir. 2008) (where a grievance procedure is made available to an inmate, the inmate must file a grievance and exhaust those remedies prior to filing a civil claim).

The undisputed evidence demonstrates that Plaintiff failed to exhaust administrative remedies pertaining to his claims against Sheriff Brown and Lieutenant Lee. Plaintiff, having previously been detained at the HCJ four or five times, admits he was aware of the HCJ's inmate request forms. While Plaintiff claims there is no *formal* grievance process at the HCJ, the inmate request forms accomplish the same goal in affording the HCJ an opportunity to address issues pertaining to conditions of confinement. *See Jones*, 549 U.S. at 219 (the benefits of exhaustion "include allowing a prison to address complaints about the program it administers before being subjected to suit," and "reducing litigation to the extent complaints are satisfactorily resolved"). Th evidence demonstrates that Plaintiff never filed grievances (or inmate request forms) pertaining to the issues he complains about in his second amended complaint. Even assuming Plaintiff did ask

Nurse Brown to schedule an appointment for him with a mental health professional, there is no evidence demonstrating that Plaintiff ever inquired as to the status of that appointment or otherwise raised the issue with the proper officials via an inmate request form. There is also no evidence demonstrating that Plaintiff ever filed an inmate request form challenging the fact that he was not afforded a disciplinary review prior to the alleged punishment following his second suicide attempt.

Although Plaintiff did eventually send his letter to the Holmes County Sheriff's Office on December 2, 2015—two days before he filed the instant lawsuit—Captain Tate did not respond to that letter until January 4, 2016. Accordingly, even assuming Plaintiff's letter and Captain Tate's response constitute exhaustion of his claims, the claims were not exhausted until one month after Plaintiff filed this action in federal court.[9] This is insufficient to constitute proper exhaustion under the PLRA. *See Smith v. Terry*, 491 F. App'x 81, 83 (11th Cir. 2012) ("The only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint."); *Brown v. Sikes*, 212 F.3d 1205, 1207 (11th Cir. 2000) ("[W]hen a state provides a

---

[9] With respect to his complaint that he was punished without having a disciplinary hearing, Plaintiff's letter only references Lieutenant Lee. Thus, assuming his letter and the response did constitute exhaustion, that exhaustion does not include his due process claim against Sheriff Brown.

grievance procedure for its prisoners . . . an inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure before pursuing a § 1983 lawsuit."); *see also Williams v. Barrow*, 559 F. App'x 979, 987 (11th Cir. 2014) (prisoner failed to properly exhaust administrative remedies because his appeal was not denied until after he filed his complaint in the district court).

Moreover, although Plaintiff remained at the HCJ for only approximately one month after first speaking with Nurse Brown and was immediately transferred to state prison following his escape and capture on July 23, 2014, Plaintiff's letter to the Holmes County Sheriff's Office and Captain Tate's response demonstrate that transfer did not eliminate the administrative remedy. *See Bryant*, 530 F.3d at 1379 (prisoner failed to exhaust administrative remedies because he could have filed an out-of-time grievance upon being transferred to another prison where threat of violence was removed and shown good cause for its untimeliness); *Napier v. Laurel Cty.*, 636 F.3d 218, 223–25 (6th Cir. 2011) (transfer from county jail to state correctional institution did not affect prisoner's obligation to exhaust administrative remedies where nothing in the county jail's procedure explicitly prohibited inmates from filing grievances after being released from the jail); *Thompson v. Bliss*, No. 8:11-cv-839-T-30TBM, 2013

WL 393487, at *2 (M.D. Fla. Jan. 31, 2013) (plaintiff failed to exhaust administrative remedies where despite being transferred from the jail seven days after injury, there was no indication that the jail's grievance procedure was no longer available to plaintiff prior to filing lawsuit).

Plaintiff's letter also demonstrates that despite Plaintiff's mental status while detained at the HCJ, Plaintiff's lack of writing utensils while in the suicide-watch cell at HCJ, and Plaintiff's lack of knowledge about a formal grievance process at the HCJ, Plaintiff was nonetheless able to file a grievance and exhaust his claims after being transferred to FDOC custody. Plaintiff's claims against Sheriff Brown and Lieutenant Lee should therefore be dismissed for failure to exhaust administrative remedies.

### 2.    *Compensatory and Punitive Damages*

Sheriff Brown and Lieutenant Lee next contend that even assuming Plaintiff had properly exhausted administrative remedies, Plaintiff is not entitled to compensatory or punitive damages because he failed to prove that he suffered any physical injury.

Under the PLRA, "[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). In the Eleventh Circuit,

compensatory and punitive damages are unavailable under § 1997e(e) absent physical injury. *Al-Amin v. Smith*, 637 F.3d 1192, 1199 (11th Cir. 2011); *Smith v. Allen*, 502 F.3d 1255, 1271 (11th Cir. 2007); *see also Harris v. Garner*, 216 F.3d 970, 984–85 (11th Cir. 2000) (the physical injury requirement applies to all federal claims, including constitutional claims).

"[T]he physical injury must be more than de minimis, but need not be significant." *Harris v. Garner*, 190 F.3d 1279, 1286 (11th Cir. 1999), *vacated*, 197 F.3d 1059, *reinstated in relevant part*, 216 F.3d at 972; *see Thompson v. Sec'y, Fla. Dep't of Corrections*, 551 F. App'x 555, 557 n.3 (11th Cir. 2014) (noting that the Eleventh Circuit has not adopted a definition of "de minimis," but acknowledging "one court has described it as 'a physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional'") (quoting *Luong v. Hatt*, 979 F. Supp. 481 (N.D. Tex. 1997). Discomfort does not equate to physical injury. *Dixon v. Toole*, 225 F. App'x 797, 799 (11th Cir. 2007); *Quinlan v. Personal Trans. Servs., Co.*, 329 F. App'x 246, 249 (11th Cir. 2009) (pretrial detainee's complaints of headaches, difficulty breathing, temporary chest pain, and lingering back pain were not greater than *de minimis* injuries); *Jimenez v. Reeder*, No. 5:08cv345/MCR/MD, 2009 WL 700776, at *2 (N.D. Fla. Mar. 16, 2009) (allegations of "pain and suffering"

were equivalent to mental and emotional injuries).

Even assuming Plaintiff had properly exhausted administrative remedies prior to filing suit—which he did not—the Court agrees that Plaintiff is not entitled to compensatory or punitive damages on his claims against Sheriff Brown or Lieutenant Lee. Turning first to his claim that Sheriff Brown and Lieutenant Lee denied Plaintiff medical care following escape and capture on July 23, 2014, the relevant injuries about which Plaintiff complains consist of thorn cuts, bruises, and insect bites. These "injuries" do not rise above the de minimis level to constitute a physical injury under the PLRA. *See Ledlow v. Givens*, 500 F. App'x 910, 914 (11th Cir. 2012) (inmate's bloody nose was a *de minimis* physical injury); *Mann v. McNeil*, 360 F. App'x 31, 32 (11th Cir. 2010) (plaintiff's claims for compensatory and punitive damages were barred by § 1997e(e) where plaintiff complained of vague injuries to his back and scrapes and marks on his knees and legs); *Parker v. Dubose*, No. 3:12cv204/MCR/CJK, 2013 WL 4735173, at *2 (N.D. Fla. Sept. 3, 2013) (concluding that plaintiff's black eye, bloody lip, scrapes, abrasion, and back pains did not amount to more than *de minimis* physical injury and were insufficient to meet § 1997e(e)'s physical injury requirement); *Hall v. Plumber Official*, No. 10-20814, 2011 WL 1979721, at *14 (S.D. Fla. Apr. 26, 2011) (allegations of dehydration,

severe diarrhea, gastroesophogeal reflux disease, chest pain, abdominal pain, bleeding gums, plaque buildup, depression, and constant, severe, and unnecessary pain did not show an injury greater than *de minimis*).

Similarly, with respect to his claim that Sheriff Brown and Lieutenant punished him by denying him basic human needs in the suicide-watch cell without a disciplinary review, Plaintiff has provided no evidence that he suffered any physical injuries whatsoever from the alleged "punishment."

Finally, with respect to Sheriff Brown and Lieutenant Lee's alleged denial of mental healthcare—which Plaintiff says caused him to attempt suicide— the Eleventh Circuit has not yet addressed whether injuries of a self-inflicted nature, such as those alleged by Plaintiff, are sufficient to establish more than de minimis injuries for PLRA purposes. Other federal courts, however, have addressed the issue. Other court have held that self-inflicted injuries by inmates in suicide attempts do not constitute "physical injury" under the PLRA. *See Argetsinger v. Ritter*, 2009 WL 3201088, at *4 (D. Colo. Sept. 29, 2009) (inmate's self-inflicted arm laceration did not amount to a "physical injury" under the PLRA, noting that "allowing a self-inflicted injury to satisfy the physical injury requirement of § 1997e(e) would create a perverse incentive of self harm in prison populations"); *Steyer v. Rogers*, No. 07–3350(DRD), 2008 WL 508596, at

*4 (D.N.J. Feb. 21, 2008) ("[Plaintiff] does not allege any physical injury suffered at the hands of Defendants. His only injuries were self-inflicted and resulted from his suicide attempt. Therefore, even if [plaintiff's] Complaint had stated a cause of action under § 1983, it would be barred by § 1997e(e) because [plaintiff] has failed to allege a prior physical injury."); *Matagrano v. New York State Dep't of Corr.*, No. 98 CIV. 428(AKH), 1999 WL 675974, at *2 (S.D.N.Y. Aug. 31, 1999) (finding that inmate failed to demonstrate that he suffered any physical injury—other than self-inflicted injuries—caused by defendants); *see also Beau v. Watson*, No. 7:09-cv-00232, 2009 WL 1764834, at *2 (W.D. Va. June 22, 2009) ("[A]n inmate cannot create the imminent danger so as to escape the three strikes provision of the PLRA. To allow inmates to allege future infliction of self-harm to bypass § 1915(g) wold eviscerate Congress' intent to limit the frequency of inmates' frivolous suits."); *Wallace v. Cockrell*, No. 3:02-CV-1807-M, 2003 WL 21418639 (N.D. Tex. Mar. 10, 2003) (prisoner's threat of self-inflicted injury was insufficient to show he was in imminent danger of serious physical injury for purposes of the PLRA's "three-strikes" provision because allowing a prisoner to create the imminent danger by self-inflicting serious physical injury would eviscerate the "three-strikes" rule). Consistent with reasoning in these cases the Court concludes that

self-inflicted injuries do not, and cannot, rise to the level of a physical injury

under the PLRA. Thus, while Plaintiff sustained lacerations, hypothermia,

leukocytosis,[10] hypovolemia,[11] and anemia from his suicide attempts,

Plaintiff's self-inflicted injuries are insufficient as a matter of law to meet the

physical injury requirement under the PLRA.

　　　Plaintiff argues that failing to recognize a self-inflicted injury as

sufficient to meet the physical injury requirment under the PLRA would be

"manifestly unjust" because it "would undully [sic] protect officials who wish

to physically harm suicidal persons by blocking access to necessary

mental healthcare and thus allow physical injuries to occur intentionally."

(ECF No. 117 at 4; ECF No. 119 at 4.) The Court is not persuaded by this

argument. If an official intentionally allowed physical injuries to occur (i.e.,

failed to intervene in an officer's use of excessive force against an inmate

that resulted in a broken arm or intentionally refused to provide medical

treatment for a broken arm) or personally physically harmed an inmate,

those injuries, could indeed constitute a physical injury for PLRA purposes.

In this case any "injuries" Plaintiff incurred arising from Sheriff Brown or

---

　　　[10] Leukocytosis is an abnormally large number of white blood cells "as observed in acute infections, inflammation, hemorrhage, and other conditions." Stedmans Med. Dictionary 490890.

　　　[11] Hypovolemia is "[a] decreased amount of blood in the body." Stedmans Med. Dictionary 431290.

Lieutenant Lee's alleged failure to provide mental health treatment would be mental or emotional injuries—not physical injuries. And to the extent Plaintiff's claims rest upon the alleged emotional damage he suffered while incarcerated at HCJ, Plaintiff cannot seek compensatory and punitive damages for mental and emotional damages without physical injury. His claims for compensatory and punitive damages from Sheriff Brown and Lieutenant Lee should therefore be dismissed.[12]

### 3.   *Declaratory Relief*

Sheriff Brown and Lieutenant Lee further argue that Plaintiff's release from the HCJ moots his claim for declaratory relief. As an initial matter, it appears that Plaintiff's request for "declaratory relief" simply seeks a determination that Defendants violated his constitutional rights and committed various torts under state law. (Compl. at 22–23.) Nevertheless, to the extent Plaintiff's request can be liberally construed as seeking any type of injunctive relief, the Court agrees that his request is moot because he is no longer in the custody of the HCJ. *See, e.g.*, *Dudley v. Stewart*, 724 F.2d 1493, 1494 (11th Cir. 1984) (a prisoner's transfer or release from prison will moot his individual claims for injunctive or declaratory relief

---

[12] Even assuming Plaintiff's self-inflicted injuries constitute a "physical injury" under the PLRA, Plaintiff has nonetheless failed to prove that either the lack of mental healthcare, Sheriff Brown, or Lieutenant Lee caused him to self-inflict those injuries. *See infra* § IV.B.4.

because injunctive relief is a prospective remedy meant to prevent future

injuries); *see also O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)

(attempting to anticipate when or if an individual will be arrested or

incarcerated again at the same facility whereby he might be subject to the

same conduct complained of is not "sufficiently real and immediate to show

an existing controversy").

### 4.    *Constitutional Claims*

Despite the fundamental flaws with Plaintiff's claims discussed

above, Sheriff Brown and Lieutenant Lee also argue that Plaintiff's claims

fail on the merits and that they are entitled to qualified immunity. The Court

agrees that Sheriff Brown and Lieutenant Lee are entitled to qualified

immunity and summary judgment on Plaintiff's constitutional claims.

"[G]overnment officials performing discretionary functions generally

are shielded from liability for civil damages insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982). To determine whether qualified immunity applies to a

government official performing a discretionary function, a court must

consider two factors: (1) whether the evidence shows that the official's

conduct violated a constitutional right; and (2) whether the right was clearly established. *Person v. Callahan*, 555 U.S. 223, 236 (2009). A court has the discretion to address the two prongs in either order. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The parties do not dispute that Sheriff Brown and Lieutenant Lee were local government officials acting within their discretionary authorities during the events at issue. The question, therefore, is whether Sheriff Brown or Lieutenant Lee violated Plaintiff's clearly established constitutional rights of which a reasonable officer would have known.

Plaintiff has not identified any Supreme Court cases establishing that circumstances even remotely similar to the circumstances in this case constitute deliberate indifference, a violation of due process, or cruel and unusual punishment. Nor is the Court able to locate any cases clearly establishing that the actions of the Defendants in this case violate a detainee's/inmate's constitutional rights.

**a.    Deliberate Indifference**

Deliberate indifference to the serious medical needs of prisoners violates the Eighth Amendment's prohibition against cruel and unusual punishment. U.S. Const. amend. VIII, *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). To establish an Eighth Amendment violation stemming from the deprivation of medical attention, a prisoner must set forth evidence of an objectively serious medical need and prove that the officials acted with attitudes of deliberate indifference to his needs. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003); *see Goebert*, 510 F.3d at 1326 (pretrial detainee's claims of deliberate indifference arise under the Fourteenth Amendment rather than the Eighth Amendment but are nonetheless evaluated under the same standard as a prisoner's claim of inadequate care under the Eighth Amendment). A plaintiff has a "serious medical need" when the condition "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994). To show that the prison official was deliberately indifferent, the plaintiff must prove that: (1) the prison official had a subjective knowledge of a risk of serious harm; (2) the prison official disregarded that risk; and (3) did so by

conduct that is more than mere negligence. *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (the prisoner must demonstrate that the officials' response was so inadequate as to "constitute an unnecessary and wanton infliction of pain," and was not "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." Incidents of negligence or medical malpractice, however, do not rise to the level of a constitutional violation. *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991); *Estelle*, 429 U.S. at 105–06 (neither "inadvertent failure to provide adequate medical care" nor "negligen[ce] in diagnosing or treating a medical condition" amounts to deliberate indifference to a serious medical need). Importantly, a plaintiff alleging an Eighth Amendment violation must show that the injury was caused by defendant's wrongful conduct. *Goebert*, 510 F.3d at 1326.

Generally, an inmate who receives a medical diagnosis and care, but desires a different diagnosis or treatment, cannot show deliberate indifference. *Hamm v. DeKalb County*, 774 f.2d 1567, 1575 (11th Cir. 1985); *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle*, 429 U.S. at 107) ("[A]s *Estelle* teaches, the question of whether

governmental actors should have employed additional diagnostic techniques or forms of treatment is a 'classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment."); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("'[W]e disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment. Along with all other aspects of health care, this remains a question of sound professional judgment.'"); *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988) ("Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice.").

The Court finds that no reasonable jury could conclude that Sheriff Brown or Lieutenant Lee had subjective knowledge of a risk of serious harm to Plaintiff from the thorn cuts, bruises, and insect bites he sustained during his escape on July 23, 2014. Surely these relatively minor injuries are not "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill*, 40 F.3d at 1187. Plaintiff also admits he was covered in mud upon his return to the HCJ, which

presumably would hide such minor injuries as thorn scratches, insect bites (to the extent they were even visible), and bruises (to the extent they were already visible after only two hours). Plaintiff has therefore not demonstrated that Sheriff Brown or Lieutenant Lee disregarded any serious risk to Plaintiff. Even assuming they had disregarded his injuries, in light of the minor nature of the injuries and the ongoing search for the lost jail keys, no reasonable jury could conclude that Sheriff Brown or Lieutenant Lee deliberately disregarded any risk to Plaintiff by more than mere negligence.

Likewise, the undisputed evidence demonstrates that neither Sheriff Brown nor Lieutenant Lee was deliberately indifferent to Plaintiff's mental health needs. A prisoner's right to receive adequate medical treatment encompasses a right to psychiatric and mental healthcare, as well as a right to be protected from self-inflicted injuries, including suicide. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.,* 402 F.3d 1092, 1115 (11th Cir. 2005) (quoting *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994)). To establish liability under § 1983 for a prisoner's self-harm, the plaintiff must show that the jail official displayed deliberate indifference to the prisoner's self-inflicted harm. *See id.* at 1115.

"[D]eliberate indifference requires that the defendant deliberately disregard a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." *Id.* (internal quotations omitted). "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." *Tittle v. Jefferson Cty. Comm'n*, 10 F.3d 1535, 1540 (11th Cir. 1994). "To be deliberately indifferent to a strong likelihood that the prisoner will harm himself, the official must be subjectively aware that the combination of the prisoner's self-harm tendencies and the feasibility of self-harm in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will self-inflict harm." *Watson v. Edelen*, 76 F. Supp. 3d 1332, 1368–69 (N.D. Fla. 2015) (citing *Gish v. Thomas*, 516 F.3d 952, 954–55 (11th Cir. 2008)).

Turning first to Sheriff Brown, there is no evidence whatsoever even suggesting that Sheriff Brown knew about Plaintiff's mental health problems. Plaintiff affirmatively represented during each HCJ booking that he was not suicidal and had never attempted suicide. Plaintiff was incarcerated at the HCJ for approximately five months without any self-harm incidents. Plaintiff never submitted any inmate request forms for mental healthcare while he was at the HCJ. Plaintiff also admits he never

told Sheriff Brown about his suicide attempts and also does not know if anyone else did either. Indeed, Sheriff Brown did not have involvement until after Plaintiff's escape and capture on July 23, 2014.

In sum, there is simply no evidence demonstrating that Sheriff Brown knew of Plaintiff's suicide attempts on June 19, 2014 or June 30, 2014, or that Sheriff Brown had any reason to believe Plaintiff wanted or needed mental healthcare. Thus, Plaintiff has not, and cannot, establish that Sheriff Brown was deliberate indifferent to Plaintiff's serious medical needs.

With respect to Lieutenant Lee, the evidence shows that Lieutenant Lee learned of Plaintiff's mental health issues on June 19, 2014, following Plaintiff's first suicide attempt. There is no evidence suggesting that Lieutenant Lee was subjectively aware of Plaintiff's self-harm tendencies prior to June 19, 2014. As discussed, Plaintiff never filled out any inmate request forms seeking mental health treatment and never disclosed any prior suicide attempts or mental health issues. *See Jacoby v. Baldwin Cty.*, 596 F. App'x 757, 763–64 (11th Cir. 2014) (defendants did not have subjective knowledge of a risk of serious harm before detainee's first instance of self-harm where detainee represented on his initial medical

assessment that his suicidal thoughts and tendencies were past, not present, and defendants did not observe any symptoms of mental illness). Upon learning that Plaintiff had harmed himself on June 19, 2014, Lieutenant Lee immediately told the officer to call for EMS. Lieutenant Lee then accompanied Plaintiff to DMH with EMS. Dr. Welch provided the discharge instruction that Plaintiff be placed on suicide precautions and have a follow-up evaluation within one to two days upon Plaintiff's discharge from DMH. Consistent with these discharge instructions Plaintiff was placed in the suicide-watch cell upon return from to HCJ. Plaintiff admits that HCJ staff thereafter checked on him every fifteen minutes. The record is silent as to whether Plaintiff had a follow-up evaluation within one to two days. Even assuming he did not, there is no evidence demonstrating that Lieutenant Lee knew that Plaintiff did not have a follow-up evaluation, and Nurse Brown nonetheless evaluated Plaintiff approximately a week to two weeks later and determined that Plaintiff could be released from the suicide-watch cell.

In light of Plaintiff's placement in the suicide-watch cell with monitoring every fifteen minutes, and Nurse Brown's evaluation (assuming she even knew) there is no evidence demonstrating that Lieutenant Lee

knew or should have know there was a strong likelihood that Plaintiff would self-inflict harm in the future. Although there was arguably a mere possibility that Plaintiff would inflict further self-harm in the future, the absence of any prior suicide attempts or mental health issues does not suggest there was a strong likelihood that the self-inflicted harm would occur in the future.

After Plaintiff's second suicide attempt on June 30, 2014 (which occurred during Plaintiff's escape attempt and after he realized that his escape attempt had failed), Lieutenant Lee immediately responded to the HCJ, where Plaintiff was already in the suicide-cell awaiting EMS. Lieutenant Lee again accompanied Plaintiff to DMH with EMS. In accordance with Nurse Frost's discharge instructions, Plaintiff was immediately placed in the suicide-watch cell upon his return from DMH and checked on every fifteen minutes. Plaintiff then escaped from the suicide-watch cell on July 23, 2014. Plaintiff was placed in a holding cell upon his capture and return to the HCJ, at which time Lieutenant Lee was present. Plaintiff was transferred to state prison the next morning. No reasonable jury could conclude that Lieutenant Lee should have known there was a strong likelihood Plaintiff would inflict further self harm (by "attempting

suicide" a third time upon escape by asking police to shoot him) because Plaintiff had escaped from the suicide cell—the very place that should have eliminated the feasibility of self-harm.

Finally, even if Lieutenant Lee should have prohibited Plaintiff from being released from the suicide-watch cell after his first suicide attempt or should have ordered Plaintiff to undergo mental health treatment, there is no evidence even suggesting that either of these actions would have prevented Plaintiff from attempting self-harm in the future. Notably, Plaintiff managed to escape from the suicide-watch cell—just as he did from his regular cell—and inflict self-harm. Furthermore, there is simply no evidence that any mental health professional would have prescribed medication or that any medication would have prevented Plaintiff from self-inflicting harm. Plaintiff's deliberate indifference claim against Lieutenant Lee therefore fails.

### b.    Due Process

The Fourteenth Amendment provides detainees and inmates the right not to be deprived of life, liberty, or property without due process of law. U.S. Const. amend. XIV; *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974); *see Jacoby v. Baldwin Cty.*, 835 F.3d 1338, 1346 (11th Cir. 2016)

(due process claim pertaining to pretrial detainee arises under the Fourteenth Amendment and is evaluated using the same standard as a due process claim pertaining to a convicted inmate). The Due Process Clause provides two types of constitutional protections: (1) substantive due process; and (2) procedural due process. *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994). Both types of due process claims require a plaintiff to prove that he was deprived of a fundamental constitutionally protected liberty or property interest. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (the first step in a substantive due process analysis is to identify the fundamental constitutional right at stake); *Anderson v. Chapman*, 604 F. App'x 810, 813 (11th Cir. 2015) (a procedural due process claim under § 1983 requires a plaintiff to prove three elements: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process"). The list of fundamental rights is short. *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007).

The right to personal security and safe conditions is a liberty interest protected by the Due Process Clause. *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). A state also has a constitutional obligation to provide adequate food, shelter, clothing, and medical care. *Id.* Prisoners do not have an

inherent right, however, in remaining free from disciplinary or administrative segregation. *Sandin v. Conner*, 515 U.S. 472, 486 (1995); *Brown v. Nix*, 33 F.3d 951, 954 (8th Cir. 1994) (there is no fundamental right to be housed in the general prison population). Instead, the Due Process Clause protects state-created liberty interests which are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484; *Kirby v. Siegelman*, 195 F.3d 1285, 1291 (11th Cir. 1999) (due process is required "when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life'"). Determining whether a restraint is an atypical and significant hardship requires a court to conduct a fact dependent analysis and consider: (1) differences between the challenged condition and the conditions imposed on inmates in administrative segregation and protective custody; (2) the condition's duration and the degree of restraint; and (3) whether the condition inevitably will affect the duration of the prisoner's sentence. *Ramirez v.*

*Galaza*, 334 F.3d 850, 861 (9th Cir. 2003).

It is well established that because temporary confinement in disciplinary segregation is neither a dramatic departure from the ordinary conditions of confinement, nor a major disruption in a prisoner's environment, there is no right to procedural due process before the imposition of disciplinary segregation. *See Sandin*, 515 U.S. at 486 (prisoner's thirty-day disciplinary segregation "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest"); *Anderson*, 604 F. App'x at 813 (pretrial detainee's placement in administrative segregation did not violate due process where placement was under conditions substantially similar to anyone facing charges similar to plaintiff and was done to ensure plaintiff's safety and minimize the risk between inmates); *Walker v. Grable*, 414 F. App'x 187, 188 (11th Cir. 2011) (placement in administrative segregation for eleven days did not involve a loss of a due process liberty interest); *Garlington v. Haley*, No. Civ.A. 00-0019-RV-M, 2001 WL 530451, at *5 (S.D. Ala. May 10, 2001) (confinement to disciplinary segregation for thirty to forty-five days did not implicate prisoner's due process rights); *cf. Williams v. Fountain*, 77 F.3d 372, 374 n.3 (11th Cir. 1996), *cert. denied*, 519 U.S. 952 (1996) (twelve months of solitary confinement constituted liberty

deprivation entitling inmate to due process because the significant length of confinement "represent[s] substantially more atypical and significant hardhip[s] . . . in relation to the ordinary incidents of prison life").

When analyzing Plaintiff's claims there is an important difference between Plaintiff's placement in the suicide-watch cell and the relative conditions in the suicide-watch cell—which are required for the detainee's own safety and the safety of others—and an inmate's placement in disciplinary segregation. Nevertheless, to the extent Plaintiff's placement in the suicide-watch cell could (in some imaginative sense) be considered "discipline" or "punishment," Plaintiff's mere placement in the suicide-watch cell did not involve a loss of a due process liberty interest such that Plaintiff should have been afforded a hearing.

With respect to the conditions in the suicide-watch cell, there is no inherent right to a toothbrush, writing utensils, room cleaning supplies, showering, or non-special management meals. While these conditions were likely more restrictive than those imposed on other detainees and inmates at the HCJ—who were not on suicide-watch—no reasonable jury could find that the conditions were so severe as to impose a significant hardship on Plaintiff in the context of prison life. By the time Plaintiff returned to the HCJ on June 30, 2014, Plaintiff had already attempted

suicide on two occasions (once with a razor and once with a piece of broken safety glass), used some type of shank in an assault on a guard, and had attempted to escape from the HCJ. No reasonable jury could conclude that prohibiting Plaintiff's possession of items (such as a toothbrush, writing utensils, disinfectant, cutlery, or plastic plates and cups) that could be used to harm himself or others, as well as limiting his proximity to areas where he could harm himself or others, imposed significant hardship on Plaintiff such that he should have been afforded a disciplinary hearing. *See LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993) (inmate's allegations about the use of Nutraloaf did not rise to the level of a significant deprivation because while the Constitution requires prison food to be nutritionally adequate, it does not require prison food to be tasty or aesthetically pleasing); *Spaulding v. Bass*, 2016 WL 4750075, at *8 (N.D. Fla. Aug. 10, 2016) (inmate's placement on special management meal for one day without disciplinary hearing did not give rise to a due process claim because an inmate does not have a liberty interest in receiving a particular type of meal); *White v. Marshall*, No. 2:08cv362-CSC, 2008 WL 4826283, at *3–4, 9 (M.D. Ala. Nov. 5, 2008) (imposition of restrictions while on suicide-watch, including lack of mattress, blanket, commode, wash basin, personal hygiene items, a lightbulb, or ventilation,

and the inability to take a shower for a period of twenty days did not equate to a deprivation of the "minimal civilized measures of life's necessities"); *Lloyd v. Briley*, No. 05 C 1499, 2007 WL 917385, at *7–8 (M.D. Ill. Mar. 23, 2007) (placement in strip cell for thirteen days without sheets, toilet paper, any personal property, and only a urine-stained mattress to sleep did not give rise to a procedural due process claim).

For these reasons, Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact regarding whether he was denied a fundamental constitutionally protected liberty interest. His due process claims against Sheriff Brown and Lieutenant Lee therefore fail.

Finally, to the extent Plaintiff's claim is construed as a stand-alone cruel and unusual punishment claim, his claim also fails.[13] Prison officials have a duty under the Eighth Amendment, to "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Bernnan*, 511 U.S. 825, 832 (1994). "Generally speaking, [however,] prison conditions rise to the level of an Eighth Amendment violation only when the 'involve the wanton and unnecessary infliction of pain.'" *Chandler v.*

---

[13] Although Plaintiff's claim is predominantly a due process claim under the Fourteenth Amendment, he does claim that the conditions in the suicide-watch cell violated his rights under the Eighth Amendment. (Compl. at 20.) At the time, Plaintiff had already been convicted, so an Eighth Amendment claim would pertain to the conditions of confinement, not due process.

*Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The Supreme Court has developed a two-part analysis governing Eighth Amendment challenges to prison conditions. *Id.* Under the objective prong, the prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). To be sufficiently serious, the condition must be extreme, thereby posing an unreasonable risk of serious damage to his future health or safety. *Chandler*, 379 F.3d at 1289 (citing *Hudson*, 503 U.S. at 9; *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). Under the subjective prong, the prisoner must prove that the prison official "acted with a sufficiently culpable state of mind" with respect to the condition at issue. *Hudson*, 503 U.S. at 8. To act with a sufficiently culpable state of mind, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A prison official's mere negligence does not give rise to a deliberate indifference claim. *See Farrow*, 320 F.3d at 1245 ("[D]eliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.").

Prohibiting a suicidal and dangerous inmate from possessing a toothbrush, writing utensils, and cell disinfectant for twenty-three days surely does not pose an unreasonable risk of serious damage to Plaintiff's future health or safety. Rather, prohibiting those items *benefitted* his future health and safety. Likewise, the special management meal ensured that Plaintiff did not have access to cutlery and plastic or paper cups and plates which could have been used to inflict self-harm or harm others. There is also no evidence suggesting that Plaintiff ever failed to receive the special management meal or that the special management meal was not nutritionally adequate. *See Hamm*, 774 F.2d at 1575 (the constitution only requires that prisoners be provided a well-balanced meal, containing sufficient nutritional value to preserve health).

Plaintiff's mere dislike of the special management meal does not pose a serious risk of harm to him. To the extent Plaintiff argues that he was on the special management meal longer than HCJ policies allowed, an institution's failure to follow its own policy does not in and of itself give rise to a constitutional violation. *Davis v. Scherer*, 468 U.S. 183, 194–95 (1984) (violation of a statutory or administrative provision did not give rise to a constitutional claim); *Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986) (failure of prison officials to follow their own rules does not establish

a constitutional violation).

Finally, while Plaintiff's complaints that he only was allowed to brush his teeth once and was not allowed to shower for twenty-three days may have been unpleasant and not something the Court condones, Plaintiff has not suggested (nor offered any evidence) demonstrating how this posed a serious risk of harm to his health or safety. Nor has he demonstrated that these conditions were "so totally without penological justification that it result[ed] in the gratuitous infliction of suffering," specifically in light of his self-harm tendencies, escape attempt, and his assaulting a guard. *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976); *Wilson v. Timko*, 1992 WL 185446, at *3 (9th Cir. Aug. 5, 1992) (turning off water and stripping inmate's cell did not violate Eighth Amendment because the sanction was in response to inmate's disruptive and destructive behavior in flooding his cell and the adjoining tier).

Even assuming that Plaintiff was unable to brush his teeth more than once and could not shower for twenty-three days, there is no suggestion that either of these restrictions posed a risk of serious harm. And if these restrictions did, there is absolutely no evidence that either Sheriff Brown or Lieutenant Lee even knew of these conditions. Plaintiff's conditions of confinement claim therefore fails as a matter of law.

### 5.    State Law Claims

With regard to Plaintiff's state law claims, Sheriff Brown and Lieutenant Lee contend: (1) Plaintiff's state law claims are untimely; (2) Plaintiff has failed to establish IIED; and (3) they are immune from suit on Plaintiff's state law claims.

As to timeliness, the Court agrees that Plaintiff's state law claims are untimely. "A civil action is barred unless begun within the time period prescribed in chapter 95, or if a different time is prescribed elsewhere in the statutes, within the time prescribed elsewhere." Fla. Stat. § 95.011. Florida law requires a prisoner[14] to bring an action relating to the conditions of his confinement within one year. Fla. Stat. § 95.11(5)(g). Florida law also provides, however, that "[e]very claim against the state or one of its agencies or subdivisions for damages for a negligent or wrongful act or omission pursuant to this section shall be forever barred unless the civil action is commenced by filing a complaint in the court of appropriate jurisdiction within 4 years after such claim accrues . . . ." Fla. Stat. § 768.28(14). Thus, the question becomes which statute of limitations applies to Plaintiff's state law claims.

---

[14] Fla. Stat. § 57.085 defines the term "prisoner" as "a person who has been convicted of a crime and is incarcerated for that crime or who is being held in custody pending extradition or sentencing."

The Florida Supreme Court recently addressed this issue in *Green v. Cottrell*, holding that "the term 'conditions of the prisoner's confinement' in section 95.11(5)(g) does not encompass the situation where a prisoner alleges that he suffered *actual physical injury* due to the negligent or wrongful act or omission of an employee of a government entity." 204 So. 3d 22, 28 (2016) (emphasis added). Thus, in cases where "a prisoner files an action alleging that he suffered physical injury due to the negligent or wrongful acts or omissions of the employees of a government entity, the one-year statute of limitations period in section 95.11(5)(g) . . . does not apply." *Id.* at 29. "Instead, the four-year statute of limitations in section 768.28(14) governs." *Id.*

Plaintiff does not allege, nor does the evidence demonstrate, that he suffered actual physical injury due to Sheriff Brown or Lieutenant Lee's allegedly negligent or wrongful conduct. Plaintiff sustained no physical injuries from the conditions in the suicide-watch cell without a disciplinary review hearing. To the extent scratches, insect bites, and bruises even constitute "actual physical injury", Plaintiff sustained those injuries during his escape on July 23, 2014, not from any action or inaction by Sheriff Brown or Lieutenant Lee. Moreover, any injury caused by Sheriff Brown or Lieutenant Lee's alleged failure to provide mental healthcare would be

purely mental or emotional damage. Plaintiff's eventual self-inflicted lacerations were exactly that—self-inflicted. Similarly, Plaintiff's IIED claims allege nothing more than emotional distress. Emotional distress is not "actual physical injury." Plaintiff's state law claims are therefore subject to the one-year limitations period in § 95.11(5)(g).[15]

The conduct of which Plaintiff complains occurred between June 2014 and July of 2014. Plaintiff was therefore required to file his lawsuit for negligence and IIED by July 2015. Plaintiff did not file this case until December 4, 2015. To the extent Plaintiff argues his claims should be deemed timely because he was placed in a suicide prevention program upon transfer to the FDOC and not released until April 9, 2015, even if he was (for some reason) unable to file his lawsuit until he was released on April 9, 2015, Plaintiff nonetheless had over three months after his release from suicide prevention to file his lawsuit. Plaintiff has offered no other reason he did not file his complaint until December 4, 2015. His state law claims are therefore barred by the statue of limitations.

Alternatively, even assuming his claims were timely, Plaintiff has not demonstrated that either Sheriff Brown or Lieutenant Lee intentionally

---

[15] There is no question that Plaintiff was a "prisoner" at the time he filed his complaint.

inflicted emotional distress upon Plaintiff. A claim for IIED under Florida law

requires a plaintiff to prove four elements:

> (1)  The wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result;
> (2)  the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community;
> (3)  the conduct caused emotional distress; and
> (4)  the emotional distress was severe.

*Clemente v. Horne*, 707 So. 2d 865, 866 (Fla. Dist. Ct. App. 1998)

(citations omitted). The standard for outrageous conduct in an IIED is a

high one. *See id.* at 866–67. "Generally, the case is one in which the

recitation of the facts to an average member of the community would

arouse his resentment against the actor, and lead him to exclaim,

'Outrageous!'" *Id.* at 867 (quoting *Restatement (Second) of Torts*, § 46 cmt.

d (1965)). "It is not enough that the intent is tortious or criminal; it is not

enough that the defendant intended to inflict emotional distress; and it is

not enough if the conduct was characterized by malice or aggravation

which would entitle the plaintiff to punitive damages for another tort." *Id.*

(quoting *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210, 1213

(Fla. Dist. Ct. App. 1995)).

No reasonable jury could find that Sheriff Brown or Lieutenant Lee's

conduct was outrageous beyond all bounds of decency. Notably, there is no evidence suggesting Sheriff Brown or Lieutenant Lee ever acted with malice. Furthermore, there is no evidence that Sheriff Brown even knew of Plaintiff's suicidal tendencies or knew that Plaintiff was in the suicide-watch cell.

Similarly, as soon as Lieutenant Lee learned of Plaintiff's suicidal tendencies she responded immediately, accompanied Plaintiff to DMH following both of his suicide attempts, and appropriately placed Plaintiff in the suicide-watch cell upon his return from DMH.

Further, even assuming Lieutenant Lee placed Plaintiff on the special management meal, it was reasonable for her to conclude that Plaintiff should not be allowed to utilize cutlery or have access to anything that could be used to cut himself, such as plastic or paper plates and cups.

Finally, even if Plaintiff was placed in the holding cell for, at most, twenty-four hours without clothes while he was covered in thorn scratches, insect bites, bruises, and dirt, this conduct does not rise to the level of extreme and outrageous. *Compare LeGrande v. Emmanuel*, 889 So. 2d 991, 995 (Fla. Dist. Ct. App. 2004) (conduct that is "unsettling, embarrassing, and/or humiliating," does not rise to the level of extreme and outrageous), *with Thomas v. Hosp. Bd. Of Dirs. of Lee Cty.*, 41 So. 3d 246,

255–56 (Fla. Dist. Ct. App. 2010) (hospital's false statements about the cause of patient's death, which led to the interruption of the patient's funeral so her body could be returned for a second, more thorough autopsy, rose to the level of "atrocious and utterly intolerable behavior which cannot be condoned in a civilized society" and therefore stated claim for IIED). Sheriff Brown and Lieutenant Lee are therefore entitled to summary judgment on Plaintiff's IIED claims.

Finally, assuming, arguendo, that Plaintiff's claims were timely and that Plaintiff could allege a valid IIED claim, Sheriff Brown and Lieutenant Lee are immune from Plaintiff's state law claims. In Florida, police officers are immune from tort actions when performing duties within the course or scope of their employment. *See* Fla. Stat. § 768.28(9)(a). "Florida's waiver of sovereign immunity does not apply to, and governmental employees may be personally liable for, acts beyond the scope of their duties, committed in bad faith or with malicious purpose, or that exhibited wanton and wilful disregard of human rights, safety, or property." *McGhee v. Volusia Cty.*, 679 So. 2d 729, 730 (Fla. 1996) (citing § 768.28(9)(a)). "Conduct meeting the 'wanton and willful' standard in the context of § 768.28(9)(a), must be 'worse than gross negligence,' . . . and 'more reprehensible and unacceptable than mere intentional conduct.'" *Kastritis*

*v. City of Daytona Beach Shores*, 835 F. Supp. 2d 1200, 1225 (M.D. Fla. 2011) (citations omitted). Bad faith under § 768.28(9)(a) has been equated with the actual malice standard. *Bloom v. Alvereze*, 498 F. App'x 867, 881 (11th Cir. 2012). "[C]onduct committed in bad faith has been characterized as conduct acted out with actual malice." *Kastritis*, 835 F. Supp. 2d at 1225 (citing *Parker v. State Bd. Of Regents ex rel. Florida State Univ.,* 724 So. 2d 163, 167 (Fla. 1st DCA 1998)).

It is undisputed that Sheriff Brown and Lieutenant Lee acted within the scope of their employment. Further, as discussed, there is no evidence that Sheriff Brown or Lieutenant Lee acted with bad faith or malice. Accordingly, Sheriff Brown and Lieutenant Lee are immune from Plaintiff's state law claims.

In sum, all of Plaintiff's claims against Sheriff Brown and Lieutenant Lee are due to be dismissed for failure to exhaust. Even assuming Plaintiff's constitutional claims were properly exhausted, Plaintiff is not entitled to compensatory or punitive damages or declaratory relief. Moreover, Plaintiff's constitutional claims fail on the merits. Plaintiff's state law claims, even if they were properly exhausted are untimely.  Had Plaintiff filed the claims timely, Plaintiff's IIED claim still fails on the merits. Lastly, notwithstanding the merits of Plaintiff's state law claims, Sheriff

Brown and Lieutenant Lee are immune from suit regarding Plaintiff's state law claims. Sheriff Brown and Lieutenant Lee's motions for summary judgment should be granted.

## B.  Nurse Brown's Motion for Summary Judgment (ECF No. 106)

Plaintiff claims Defendant Raina Brown, RN, ("Nurse Brown") was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth and Fourteenth Amendments. Plaintiff also claims that Nurse Brown's deliberate indifference constitutes negligence and medical malpractice under Florida law.

### 1.    Exhaustion

For starters, Nurse Brown argues that Plaintiff's claims should be dismissed for failure to exhaust administrative remedies. As discussed above,[16] the Court agrees that Plaintiff failed to properly exhaust administrative remedies prior to initiating this lawsuit. His claims against Nurse Brown are therefore due to be dismissed.

### 2.    Deliberate Indifference

Nurse Brown next argues that assuming, arguendo, Plaintiff had properly exhausted his claims, his deliberate indifference claim fails on the merits.

---

[16] *See supra* § IV.A.1.

Even if Plaintiff's mental health problems constitute a serious medical need—which they likely do—there is no evidence that Nurse Brown had subjective knowledge of a risk of serious harm prior to Plaintiff's first suicide attempt on June 19, 2014. Plaintiff affirmatively stated that he was not suicidal and had never attempted suicide when he was booked into the jail and never filed an inmate request form seeking mental health treatment. Even though Plaintiff spoke briefly with Nurse Brown on June 19, 2014 about being depressed, the conversation pertained solely to Plaintiff feeling depressed about losing custody of his daughter. Plaintiff admits he did not tell Nurse Brown about his suicidal feelings. *See Edwards v. Gilbert*, 867 F.2d 1271, 1275 (11th Cir. 1989) ("In the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation or any other court within this circuit that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference.").

Plaintiff also had not been diagnosed with depression by a licensed mental health professional. Instead, Plaintiff's report to Nurse Brown was his own self-diagnosis. Incarceration surely causes depressed feelings to some degree in many, if not most, detainees and inmates. And even assuming Nurse Brown did not schedule a mental health appointment for

Plaintiff as requested, Plaintiff's single request in conjunction with a brief discussion about feeling depressed, should not have put Nurse Brown on notice that Plaintiff posed a risk of harm to himself. *See id.* at 1275 n.4 (inmate's request to see the jail psychologist did not put jailers on notice that inmate was a potential suicide risk because it was not unusual for inmates to request to see psychologist and his request was not characterized as an emergency); *Jacoby*, 596 F. App'x at 763 (nurse and doctor did not have subjective knowledge that inmate posed a serious risk to himself even though on his initial assessment the inmate indicated that he had past suicidal thoughts and tendencies and his health service request indicated he suffered from bipolar disorder and depression). Thus, no reasonable jury could conclude that Nurse Brown had subjective knowledge prior to June 19, 2014, that Plaintiff posed a serious risk of harm to himself.

To the extent Plaintiff's claim rests on Nurse Brown releasing Plaintiff from the suicide cell prior to his second suicide attempt, Nurse Brown's conduct does not constitute deliberate indifference. When Plaintiff returned to the HCJ from DMH following his first suicide attempt he was placed in the suicide-watch cell and remained there for a week to two weeks. He was monitored every fifteen minutes by HCJ staff. There is no evidence that

Plaintiff had any issues or made any threats of self-harm during his time in the suicide-watch cell. Plaintiff also never requested to see a mental health professional while he was in the suicide-watch cell, nor did he fill out any inmate request forms seeking medical attention. When Nurse Brown eventually evaluated Plaintiff, he affirmatively told Nurse Brown that he was "good."

These undisputed facts do not suggest that Nurse Brown demonstrated a wanton infliction of pain upon Plaintiff, or that there was a strong likelihood Plaintiff would self-inflict harm again in the future. While Nurse Brown might have been negligent in releasing Plaintiff from the suicide-watch cell, negligence does not rise to the level of deliberate indifference. Nurse Brown is therefore entitled to summary judgment on Plaintiff's deliberate indifference claim.

### 3.    *State Law Claims*

Finally, Nurse Brown argues that both of Plaintiff's state law claims arise out of the alleged failure to render medical care and should therefore be dismissed for failing to comply with Florida's medical malpractice pre-suit requirements within the two-year statute of limitations. Nurse Brown also argues she is entitled to immunity from Plaintiff's state law claims.

The Court agrees that Plaintiff's medical negligence claim is due to

be dismissed. "Before filing any claim for personal injury . . . arising from medical malpractice [or medical negligence], Florida law requires the claimant to conduct an investigation of the claim and send the defendant notice of intent to sue, along with a corroborating opinion by a medical expert." *R.W. v. Armor Corr. Health Servs., Inc.*, 830 F. Supp. 2d 1295, 1302 (M.D. Fla. 2011); Fla. Stat. § 766.104; *see* Fla. Stat. § 766.106(1)(a) (a "'[c]laim for medical negligence' or 'claim for medical malpractice' means a claim, arising out of the rendering of, or the failure to render, medical care or services"). Failure to comply with the statutory prerequisites within the two-year statute of limitations mandates the dismissal of the medical negligence claim if it is clear that the claimant could not possibly cure the defect. Fla. Stat. § 766.206(2); § 95.11(4)(b) (providing a two-year statute of limitations for medical malpractice claims); *Kukral v. Mekras,* 679 So. 2d 278, 283 (Fla. 1996) (holding that "the failure to comply with the presuit requirements [for a medical malpractice claim] is not necessarily fatal to a plaintiff's claim so long as compliance is accomplished within the two-year limitations period provided for filing suit); *O'Hanrahan v. Moore*, 731 So. 2d 95, 96–97 (Fla. Dist. Ct. App. 1999) (dismissal of pro se inmate's medical malpractice action for failure to comply with pre-suit notice requirements should be without prejudice unless it is clear that the claimant cannot

possibly cure the defect and still maintain the action).

Plaintiff says he complied with the pre-suit notice requirements but admits he did not send the requisite medical expert opinion. Despite Plaintiff's assertion that it was impossible for him to do so because he is and has been incarcerated, inmates are nonetheless required to comply with *all* of the pre-suit requirements, including the expert opinion requirement. *See Wheeler v. Corizon Med. Health Care Servs.*, No. 5:16cv96/LAC/EMT, 2016 WL 7743516, at *3 (N.D. Fla. Dec. 27, 2016), *report and recommendation adopted*, 2017 WL 113063 (N.D. Fla. Jan. 11, 2017) (citations omitted); *O'Hanrahan*, 731 So. 2d at 96–97 (affirming dismissal of inmate's petition based on inmate's failure to produce a verifiable corroborating medical expert opinion as required for a medical malpractice action). There is no dispute that Plaintiff cannot cure the deficiency because it is well past the two-year limitations period.[17] Plaintiff's medical negligence claim is therefore due to be dismissed with prejudice.

Although Nurse Brown argues that Plaintiff's claim for negligence is in fact a claim for medical negligence, the Court disagrees. A claim for

---

[17] Plaintiff requested in his response to Nurse Brown's motion for summary judgment an extension of time and a court order or subpoena instructing the FDOC to provide Plaintiff the medical expert's opinion. (ECF No. 118 at 7.) Not only is the Court unable to order the FDOC to provide Plaintiff with a medical expert's opinion, Plaintiff's response was filed on April 24, 2017—almost a year past the conclusion of the two-year limitations period in July 2016.

medical negligence or malpractice "is one 'arising out of the rendering of, or the failure to render, medical care or services.'" *Joseph v. Univ. Behavioral LLC*, 71 So. 3d 913, 917 (Fla. Dist. Ct. App. 2011) (quoting *Mobley v. Gilbert E. Hirschberg, P.A.*, 915 So. 2d 217, 218 (Fla. Dist. Ct. App. 2005)). But, "[t]he fact that a wrongful act occurs in a medical setting does not necessarily mean that it involves medical malpractice [or medical negligence]." *Id.* (citing *Robinson v. W. Fla. Reg'l Med. Ctr.*, 675 So. 2d 266 (Fla. Dist. Ct. App. 1996); *Durden v. Am. Hosp. Supply Corp.*, 375 So. 2d 1096 (Fla. Dist. Ct. App. 1979)). "The wrongful act must be directly related to the improper application of medical services and the use of professional judgment or skill." *Id.* (citing *Liles v. P.I.A. Medfield, Inc.*, 681 So. 2d 711 (Fla. Dist. Ct. App. 1995); *S. Baptist Hosp. of Fla., Inc. v. Ashe*, 948 So. 2d 889, 890 (Fla. Dist. Ct. App. 2007).

Plaintiff alleges, in part, that Nurse Brown "knew I was suicidal and repeatedly chose not to schedule me any appointment[s] with a mental health care provider for evaluation and treatment. She knew suicidal people are a serious risk to their health and it is a serious medical need of treatment, yet, she chose to merely lock me into a cell with nothing and no contact with family instead of getting me access to needed care." (Compl. at 22.) Unlike Plaintiff's assertion that Nurse Brown erred in releasing him

from the suicide-watch cell, Plaintiff's claim with respect to these particular allegations is not that Nurse Brown made a medical error, but that Nurse Brown instead consciously chose—for reasons unrelated to medical judgment—not to provide Plaintiff with mental healthcare. This alleged conduct was not directly related to the use of professional judgment or skill. *See Reeves v. N. Broward Hosp. Dist.*, 821 So. 2d 319, 322 (Fla. Dist. Ct. App. 2002) (to be deemed a medical malpractice action, "[t]he alleged wrongful act must be directly related to the improper application of medical services to the patient and the use of professional judgment or skill") (emphasis added); *Ashe*, 948 So. 2d at 891 (determining plaintiff's claim to be one of ordinary negligence, not medical negligence, where hospital employee defendant released plaintiff's daughter from hospital in violation of mandatory and non-discretionary requirements of Florida's Baker Act).

Nevertheless, Plaintiff's negligence claim is also barred by the one-year statute of limitations for claims relating to the conditions of his confinement because he did not allege—nor does the evidence demonstrate— that he suffered physical injury as a result of Nurse Brown's negligence. *See* § 95.11(5)(g); *Green*, 204 So. 3d at 28–29. Despite Plaintiff's assertion that Nurse Brown's negligence caused him to self-inflict harm, Nurse Brown's failure to schedule a mental health appointment for

Plaintiff caused, if anything, mental and emotional damage. Accordingly, Plaintiff's negligence claim against Nurse Brown is also due to be dismissed.

Finally, even assuming Plaintiff had complied with the pre-suit notice requirements, and assuming his claims were not barred by the applicable statute of limitations, Nurse Brown is entitled to immunity from both of Plaintiff's state law claims. There is no evidence that Nurse Brown acted outside the scope of her employment or with bad faith or malice. Even assuming she was negligent, or assuming she intentionally chose not to schedule a mental health appointment for Plaintiff, this does not rise to the level of wanton and willful conduct to deprive Nurse Brown of immunity. *See Kastritis*, 835 F. Supp. 2d at 1225. Nurse Brown is therefore also entitled to summary judgement on Plaintiff's state law claims.

## C.    Holmes County's Motion for Summary Judgment (ECF No. 107)

Plaintiff brings Monell claims against Holmes County, Florida ("Holmes County"), arguing that Holmes County was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment and denied Plaintiff due process in violation of the Fourteenth Amendment. *See Monell v. Dep't of Soc. Sec. of City of New York*, 436 U.S. 658, 690 (1978) (a local governing body can be sued under § 1983 where "the

action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers").[18]

Specifically, Plaintiff says Holmes County was deliberately indifferent to his serious medical needs because Holmes County knew of and maintained the HCJ's policy of not providing mental healthcare to inmates, who already were not receiving mental healthcare prior to custody, and because of the HCJ's failure to employ a licensed mental health provider to determine whether detainees and inmates are mentally fit to be released from the suicide-watch cell. Plaintiff further claims Holmes County denied Plaintiff due process because Holmes County knew of and maintained the HCJ's policy of not providing detainees and inmates disciplinary review hearings prior to punishment, which amounts to cruel and unusual punishment.

## 1. Exhaustion

Holmes County first argues that Plaintiff failed to properly exhaust administrative remedies As previously discussed, the undisputed evidence demonstrates that Plaintiff failed to exhaust administrative remedies

---

[18] Plaintiff also claimed that the actions underlying his constitutional claims against Holmes County also amounted to negligence and IIED under Florida law. Those claims, however, have been dismissed. (ECF No. 125.)

pertaining to his constitutional claims against Holmes County.[19] Plaintiff's

claims against Holmes County should therefore be dismissed for failure to

properly exhaust administrative remedies prior to filing suit.

### 2.    Monell Claims

Holmes County next argues that even assuming either there was no

grievance process for Plaintiff to exhaust his administrative remedies prior

to filing suit or that Plaintiff had properly exhausted administrative remedies

prior to filing suit, Plaintiff's constitutional claims nonetheless fail. Plaintiff's

claims against Holmes County involve three alleged HCJ policies: (1)

failure to provide mental healthcare to inmates who were not already

receiving mental healthcare prior to custody; (2) failure to employ a

licensed mental health provider to determine whether detainees and

inmates are mentally fit to be released from the suicide-watch cell; and (3)

failure to provide detainees and inmates disciplinary review hearings prior

to imposing punishment.

Section 1983 provides an avenue for redress against any person

acting under color of state law who subjects a person to the deprivation of

any right, privilege, or immunity secured by the Constitution and laws of the

United States. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("Section

---

[19] *See supra* § IV.A.1.

1983 is not itself a source of substantive rights, but merely provides a

method for vindicating federal rights elsewhere conferred."). Municipalities

and other local government units are included among those persons to

whom § 1983 applies. *Monell*, 436 U.S. at 690. A local governing body can

be sued under § 1983 where "the action that is alleged to be

unconstitutional implements or executes a policy statement, ordinance,

regulation, or decision officially adopted and promulgated by that body's

officers." *Id.* This liability extends to "constitutional deprivations visited

pursuant to governmental 'custom' even though such custom has not

received formal approval through the body's official decisionmaking

channels." *Id.*

> A plaintiff . . . has two methods by which to establish a county's
> policy: identify either (1) an officially promulgated county policy
> or (2) an unofficial custom or practice of the county shown
> through the repeated acts of a final policymaker for the county.
> . . . . Because a county rarely will have an officially-adopted
> policy of permitting a particular constitutional violation, most
> plaintiffs . . . must show that the county has a custom or
> practice of permitting it and that the county's custom or practice
> is the "moving force behind the constitutional violation." . . . .
> Under either avenue, a plaintiff (1) must show that the local
> governmental entity, here the county, has authority and
> responsibility over the governmental function in issue and (2)
> must identify those officials who speak with final policymaking
> authority for that local governmental entity concerning the act
> alleged to have caused the particular constitutional violation in
> issue.

*Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329–30 (11th Cir. 2003)

(internal quotations and citations omitted); *see also Depew v. City of St.

Mary's Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("To establish a policy or

custom, it is generally necessary to show a persistent and wide-spread

practice. . . . . Normally random acts or isolated incidents are insufficient to

establish a custom or policy."); *Ancata v. Prison Health Servs., Inc.*, 769

F.2d 700, 705 n.9 (11th Cir. 1985) (where a governmental entity delegates

the final authority to make decisions, those decisions necessarily represent

official policy).

      It is well settled that a municipality cannot be held liable under § 1983

on a respondeat superior theory, *i.e.*, solely because it employs a

tortfeasor. *Monell*, 436 U.S. at 690; *City of Canton, Ohio v. Harris*, 489 U.S.

378, 385 (1989). "The 'official policy' requirement was intended to

distinguish acts of the municipality from acts of employees of the

municipality, and thereby make clear that municipal liability is limited to

action for which the municipality is actually responsible." *Pembaur v. City

of Cincinnati*, 475 U.S. 469, 479 (1986); *see also Massey v. Montgomery

Cty. Detention Facility*, 646 F. App'x 777, 780 (11th Cir. 2016) (claim

against county detention facility's medical provider failed under *Monell*

where plaintiff failed to allege that medical provider had a policy or custom

that caused deliberate indifference to his serious medical need).

Nonetheless, "municipal liability may attach to a single decision made by a

municipal official if that municipal official is the final policymaker for the

municipality with respect to the subject matter in question." *Mandel v. Doe*,

888 F.2d 783, 793 (11th Cir. 1989) (citing *Jett v. Dallas Indep. Sch. Dist.*,

491 U.S. 701 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988);

*Pembaur*, 475 U.S. at 469).

Holmes County does not argue that Sheriff Brown is not the final

policy maker for Holmes County with respect to the operation of the HCJ.

Instead, Holmes County argues that neither it, Sheriff Brown, nor Holmes

County Sheriff's Department employees were deliberately indifferent to

Plaintiff's serious medical needs. Thus, the question for this Court is

whether the alleged policies resulted in violations of Plaintiff's constitutional

rights.

### a.    Deliberate Indifference

To hold a municipality liable for a policy or practice there must also

be a sufficient causal relationship between the policy or practice and the

violation of the plaintiff's constitutional rights. *See Bd. of Cty. Comm'rs v.*

*Brown*, 520 U.S. 397, 400 (1997) (a municipality may be held liable under §

1983 only when the enforcement of the municipal policy was the "moving

force" behind the constitutional violation); *City of Canton*, 489 U.S. at 385 (there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). Accordingly, to prevail on his deliberate indifference claims against Holmes County, Plaintiff must demonstrate three things: (1) his constitutional rights were violated; (2) the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) the policy or custom caused the violation. *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 940–41 (11th Cir. 2017).

Turning first to HCJ's alleged policy of not providing mental healthcare to inmates who were not already receiving mental healthcare prior to custody, there is absolutely no evidence that such a policy or custom exists. Although Plaintiff claims Nurse Brown told him about the HCJ's policy, Nurse Brown's statements to Plaintiff arguably constitute inadmissible hearsay. *See* Fed. R. Evid. 801(c). Even assuming, however, that Nurse Brown's statements were admissible party admissions under Rule 801(d)(2)(D) of the Federal Rules of Evidence, Nurse Brown told Plaintiff that the HCJ has a "policy" of not providing mental health *medications* to inmates that were not receiving the *medication* prior to incarceration. Nonetheless, she said that she would set up an appointment

for Plaintiff to meet with a mental health professional. A policy restricting the provision of mental health *medications* is different from a policy not to provide any mental healthcare at all (i.e., screening for mental health disorders, counseling, etc.). Thus, even if Nurse Brown's statement could be evidence of a policy or custom, that policy or custom has no relation to this case because Plaintiff's claims have nothing to do with whether he was or was not provided with mental health *medication*. Plaintiff's claim instead is on his assertion that the policy was not to provide mental health treatment.

Contrary to Plaintiff's unsupported assertion there is no evidence that the HCJ has a policy of not employing a licensed mental health provider to determine whether detainees and inmates are mentally fit to be released from the suicide-watch cell. Even assuming Nurse Brown was the only "in-house provider," there is no evidence that HCJ does not employ or contract with a licensed mental health provider. Nor is there any evidence that Nurse Brown was not capable of assessing Plaintiff to determine whether Plaintiff should be released from the suicide-watch cell. Notably, there is no evidence that a licensed mental health provider would have rendered a different conclusion than Nurse Brown. Lastly, there is no evidence in the record of any prior incidents of self-harm detainees due to the lack of a

mental health professional at the HCJ.  Thus, Plaintiff has failed to demonstrate the need to have a mental health professional employed at the HCJ and has failed to show that Holmes County was aware of the necessity for employing a mental health professional.

Plaintiff also has failed to demonstrate that the decision to release him from the suicide-watch cell had any causal relationship to Plaintiff's self-harm. Plaintiff did not attempt suicide because he was released from the suicide-watch. Rather, the two "attempted suicides" at issue here occurred during Plaintiff's unsuccessful attempts to escape from the HCJ.[20] The first suicide attempt, which Plaintiff claims was caused by the lack of mental health evaluation, occurred after Plaintiff got into a fight with a guard, tried to escape, and realized he was locked in the hallway. Plaintiff *then* unsuccessfully attempted to cut his wrists using a piece of broken

---

[20] There is no evidence demonstrating that the HCJ had notice of Plaintiff's suicidal tendencies prior to his attempted suicide on June 19, 2014. Each time Plaintiff was booked into the HCJ he affirmatively stated that he was not suicidal, had never attempted suicide, was not on any mental health medications, and had no issues the HCJ should know about. After Plaintiff was booked into the HCJ on January 15, 2014, there were no issues with Plaintiff trying to hurt himself through May 2014. Plaintiff then admits that despite telling Nurse Brown sometime prior to June 19, 2014, that he was depressed, he did not tell Nurse Brown—or anyone else—that he had suicidal thoughts. Thus, nothing prior to June 19, 2014, should have put the HCJ on notice of Plaintiff's suicidal tendencies so that he would have been in a suicide-watch cell on June 19, 2014. Instead, as soon as the HCJ got notice that Plaintiff was suicidal (i.e., on June 19, 2014), the HCJ placed Plaintiff into the suicide-watch cell upon his return from DMH and he remained there for one to two weeks until Nurse Brown determined that he could be released from the suicide-watch cell.

safety glass (which resulted in minor cuts that required only Betadine and Steri-Strips). This event has no causal relationship to the decision to release him from the suicide-watch cell without an evaluation by a licensed mental health professional.

The second attempt, which Plaintiff claims was caused by the lack of mental health evaluation, occurred after Plaintiff escaped from the suicide-watch cell—which is precisely where Plaintiff apparently believes he should have been—and then escaped from the HCJ. After he was located by the police, Plaintiff *then* told police to shoot him. Notably, nothing happened and instead the police took Plaintiff back into custody, without further incident.  Plaintiff's claim that he attempted "suicide by cop" also is not causally related to Plaintiff's release from the suicide-watch cell without an evaluation by a licensed mental health professional.  Nor could it be causally related because Plaintiff was not released from the suicide-watch cell and instead escaped. In short, not only has Plaintiff failed to show that the alleged mental healthcare policies or customs existed, he has also failed to show that the policies—if they did exist—had anything to do with his self-inflicted injuries.

Additionally, Plaintiff has also failed to prove that any HCJ employees were deliberately indifferent to his serious medical needs. *See Denham*,

675 F. App'x at 940 (to prevail on a *Monell* claim against a municipality the plaintiff must prove that his constitutional rights were violated). As discussed above, the undisputed evidence demonstrates that neither Sheriff Brown, Lieutenant Lee, or Nurse Brown were deliberately indifferent to Plaintiff's serious medical needs. Plaintiff therefore cannot maintain a *Monell* claim against Holmes County.

Finally, even assuming the HCJ did maintain the alleged policies or customs and that the individual Defendants violated Plaintiff's constitutional rights—neither of which is the case here—Plaintiff's deliberate indifference claim against Holmes County still fails because he has not demonstrated a pattern of similar constitutional violations that would have provided the requisite notice to policymakers that the policies were constitutionally deficient. *See id.* at 942–43 (providing evidence of one prior incident that was similar to the plaintiff's incident was insufficient for a jury to find a pattern of constitutional violations to hold county liable). Holmes County is therefore entitled to summary judgment on Plaintiff's deliberate indifference claims.

### b.    Due Process

Plaintiff claims, generally, that Holmes County maintains a policy of not providing detainees with disciplinary review hearings prior to imposing

punishment. He claims that this policy violated his right to procedural due process.

The undisputed facts pertinent to Plaintiff's due process claim against Holmes County are as follows. Plaintiff was placed in an administrative cell on June 19, 2014, for less than twenty-four hours following a verbal altercation with an officer. There is no evidence that he was otherwise deprived of anything during those twenty-four hours in the administrative cell. He was then placed in the suicide-watch cell on June 20, 2014, for a week to two weeks upon return from DMH after his suicide attempt. There is no evidence that he was otherwise deprived of anything during that time in the suicide-watch cell. Plaintiff was then placed in the suicide-watch cell from June 30, 2014, through July 23, 2014, after his second suicide attempt. During that time Plaintiff was not provided with a toothbrush and only temporarily given a tooth brush to brush his teeth once, not provided with writing utensils, not allowed to shower or clean his room,  and was placed on the special management meal. Finally, Plaintiff was placed in a holding cell for less than twenty-four hours on July 23, 2014, following his escape. He did not have a mattress, clothing, or toilet paper while he was in the holding cell.

Plaintiff's due process claim against Holmes County fails at the

outset because he has not established that any HCJ or Holmes County officials violated his right to procedural due process. Placement in administrative segregation for less than twenty-four hours with no other deprivations, despite not being afforded a disciplinary hearing, does not give rise to a due process violation. Likewise, placement in a suicide-watch cell for a week to two weeks after a suicide attempt with no other deprivations, despite not being afforded a disciplinary hearing, also does not give rise to a due process violation. These placements were reasonable and appropriate for any detainee or inmate who started a verbal altercation with a guard or attempted suicide.

Similarly, not being permitted to have a writing utensil, showering, cleaning his cell, possessing a toothbrush, and placement on a special management meal for approximately twenty-four days while in a suicide-watch cell without a disciplinary hearing does not give rise to a due process violation for the reasons previously discussed.[21]

Nor does the lack of a mattress, clothing, and toilet paper in a holding cell for less than twenty-four hours without a disciplinary hearing give rise to a due process claim. At that point in time Plaintiff had already attempted suicide two or three times, assaulted a guard, attempted to

---

[21] *See supra* § IV.A.4.b.

escape from HCJ once, and then successfully escaped from HCJ. No reasonable jury could conclude that the measures taken to protect Plaintiff, HCJ staff, and other inmates imposed significant hardship on Plaintiff such that he should have been afforded a disciplinary hearing. *See White*, 2008 WL 4826283, at *3–4, 9 (restrictions while on suicide-watch, including lack of mattress, blanket, and personal hygiene items for twenty days did not equate to a deprivation of the "minimal civilized measures of life's necessities"); *Lloyd*, 2007 WL 917385, at *7–8 (placement in strip cell for thirteen days without sheets or toilet paper did not give rise to a procedural due process claim).

Finally, to the extent Plaintiff's Fourteenth Amendment claim against Holmes County is construed as a stand-alone cruel and unusual punishment claim, Plaintiff's claim fails because the conditions within the suicide-watch cell did not pose an unreasonable risk of serious damage to his future health or safety.[22] Nor did placement in a holding cell without a mattress, clothing, or toilet paper for *less than* twenty-four hours following his escape from the HCJ—from the suicide-watch cell—pose an unreasonable risk of serious damage to his future health or safety. While these conditions might have been unpleasant, they do not rise to the level

---

[22] *See supra* § IV.A.4.b.

of wanton and unnecessary infliction of pain, particularly in light of

Plaintiff's dangerous tendencies, his escape, and the short duration in

which he was in the holding cell.

### 3.   *Declaratory Relief*

Holmes County also contends that Plaintiff is not entitled to injunctive

relief in light of his transfer to the FDOC. To the extent Plaintiff requests a

declaratory judgment (which typically involves injunctive relief) the Court

agrees that Plaintiff's request is moot.[23]

### 4.   *Punitive Damages*

Finally, Holmes County argues that Plaintiff is not entitled to punitive

damages under either federal or state law. The Court agrees. *See Newport*

*v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (punitive damages not

available from a governmental entity under § 1983); Fla. Stat. § 768.28(5)

("The state and its agencies and subdivisions shall be liable for tort claims

in the same manner and to the same extent as a private individual under

like circumstances, but liability shall not include punitive damages or

interest for the period before judgment."). Accordingly, even if Plaintiff had

demonstrated a disputed issue of material fact to preclude summary

judgment, he would not be entitled to seek punitive damages from Holmes

---

[23] *See supra* § IV.A.3.

County.

Nonetheless, the undisputed evidence shows that Plainitff is not entitled to relief from Holmes County. Not only did Plaintiff fail to exhaust administrative remedies prior to filing suit, his constitutional claims against Holmes County also fail on the merits. Holmes County's motion for summary judgment is therefore due to be granted.

## D.   Doctors Memorial Hospital's Motion for Summary Judgment (ECF No. 102)

Lastly, turning to DMH, Plaintiff claims DMH was deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments. Plaintiff further alleges that the actions giving rise to his constitutional claims against DMH also amount to negligence under Florida law.[24]

### 1.   *Deliberate Indifference*

DMH first argues that it is entitled to summary judgment on Plaintiff's deliberate indifference claims because there is no evidence of a custom, policy, or practice by DMH which resulted in a violation of Plaintiff's constitutional rights. DMH further argues that it was not contractually responsible for providing mental healthcare services to HCJ detainees and

---

[24] Although Plaintiff also brought claims for medical malpractice against the Hospital and for declaratory relief, those claims have been dismissed. (ECF No. 124.)

inmates. Regardless, DMH also argues Plaintiff cannot establish that anyone at DMH was deliberately indifferent to his serious medical needs.

"When a private entity . . . contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state. . . . . In so doing, it becomes the functional equivalent of the municipality. " *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997) (internal citations omitted). Thus, when a private entity contracts with a governmental entity and becomes the functional equivalent of the governmental entity, it acts under the color of state law. *Howell v. Evans*, 922 F.2d 712, 723–24 (11th Cir. 1991). The functional equivalent of the municipality, can therefore be sued under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" *Monell*, 436 U.S. at 690; *see Buckner*, 116 F.3d at 453 (affirming "the district court's finding that the *Monell* policy or custom requirement applies in suits against private entities performing functions traditionally within the exclusive prerogative of the state, such as the provision of medical care to inmates").[25]

---

[25] The same standard applies for public hospitals or those operating pursuant to a county hospital authority. *Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1317 (11th Cir. 2000). Accordingly, even assuming DMH operated pursuant to a county hospital

Plaintiff has not alleged nor provided evidence suggesting that DMH maintained a custom, policy, or practice of denying mental healthcare services to HCJ detainees and inmates. There is no evidence that DMH ever entered into a contractual relationship with Holmes County and/or the Holmes County Sheriff's Office to provide *mental health* services to HCJ detainees and inmates.  Instead, the evidence demonstrates that DMH provides routine *medical and emergency* services for HCJ detainees and inmates. DMH is neither licensed nor equipped to provide *psychiatric* services. *See Hippele v. Palm Beach Cty. Bd. of Comm'rs,* No. 09-80089-CIV, 2010 WL 3123258, at *5 (S.D. Fla. Aug. 9, 2010) (private entity, which contracted to provide medical services at county jail and subcontracted responsibility to provide mental health services to another private entity, could not be liable for deliberate indifference arising from housing decision because it was not responsible for determining whether an inmate required special housing accommodations within the mental health unit).

Further, with respect to *medical* services, evaluation and treatment decisions relating to HCJ patients is within the medical discretion of the physician or nurse in the emergency room when the patient arrives and not pursuant to custom, policy, or practice. Plaintiff's assertion that DMH failed

---

authority, the standard for liability would be the same.

to provide adequate mental health services on the two occasions he visited the hospital—which is not licensed or equipped to provide mental health services—is insufficient to establish a custom, policy, or practice. His deliberate indifference claims against DMH therefore fails. *See id.*, 116 F.3d at 453 ("the requirement of a municipal policy or custom constitutes an essential element of a § 1983 claim that a plaintiff must prove in order to establish municipal liability").

Aside from Plaintiff's failure to establish the requisite custom, policy, or practice, Plaintiff also has not demonstrated that anyone at DMH was deliberately indifferent to his serious medical needs. To the extent Plaintiff's claim is premised on the alleged failure to refer Plaintiff to a mental health counselor, it is undisputed that DMH is not licensed or equipped to provide mental health services and there is no evidence that DMH ever entered into a contract with Holmes County to do so for HCJ detainees and inmates. Rather, the evidence demonstrates that both Nurse Frost and Dr. Welch provided instructions to the HCJ upon Plaintiff's discharge that he should be placed on suicide precautions. Although not relevant to Plaintiff's claims against DMH, the evidence demonstrates that Plaintiff was in fact placed on suicide precautions as instructed upon his return to the HCJ on both occasions.

Even assuming Nurse Frost or Dr. Welch should have provided some type of referral for mental health services beyond their instruction to place Plaintiff on suicide precautions, such a failure does not rise to the level of unnecessary and unwanton infliction of pain. Nothing suggests that Nurse Frost or Dr. Welch were subjectively aware that it was feasible for Plaintiff to engage in further self-harm, particularly in light of their instruction to place Plaintiff on suicide precautions upon discharge from the hospital.

Additionally, Plaintiff has failed to demonstrate that Nurse Frost or Dr. Welch's actions (or inactions) caused any injury to Plaintiff. *See McDaniels v. Lee*, 405 F. App'x 456, 459 (11th Cir. 2010) (detainee's deliberate indifference claim failed where there was no evidence that he suffered any injury attributable to the alleged indifference). After Plaintiff was discharged from DMH following his first suicide attempt, Plaintiff remained in the suicide-watch cell for a week to two weeks without incident. There were no mental health issues until Plaintiff's failed escape attempt on June 30, 2014, which in turn led him to self-inflict harm a second time. This had no causal relationship to Dr. Welch or DMH.  After Plaintiff was discharged from DMH following his second suicide attempt, Plaintiff had no further self-harm issues at HCJ. The medical expert Dr. Epstein confirms that DMH healthcare providers did not cause or contribute to any injury to

Plaintiff. Plaintiff therefore has failed to demonstrate that DMH was deliberately indifferent to his serious mental health needs.

Plaintiff's claim also fails to the extent his claim is premised on the care he received for the injuries sustained during his two suicide attempts. DMH treated Plaintiff's self-inflicted wounds both times he presented to the hospital. *See Harris*, 942 F.2d at 1507 (where an inmate has received medical attention, and the dispute is over the adequacy of that attention, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made). There is absolutely no evidence that Plaintiff suffered any further injury as a result of the medical treatment he received at DMH. Plaintiff has therefore failed to show that DMH was deliberately indifferent to his serious medical needs. Accordingly, DMH is entitled to summary judgment on Plaintiff's deliberate indifference claim.

### 2.    *Negligence*

To the extent DMH argues that Plaintiff's negligence claim is actually one for medical negligence—or medical malpractice—the Court previously addressed this argument and concluded that Plaintiff's claim is properly construed as an ordinary negligence claim. (ECF Nos. 100, 124.)[26]

---

[26] Even assuming Plaintiff's negligence claim was in fact one for medical negligence (or medical malpractice), the Court has already dismissed that claim for failure to comply with the pre-suit notice requirements. (ECF Nos. 100, 124.)

Plaintiff's negligence claim fails on the merits.

A negligence claim under Florida law requires a plaintiff to prove four elements: (1) a duty to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a breach of that duty; (3) a "reasonably close causal connection" between the breach and the resulting injury; and (4) actual injury. *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007).

Plaintiff has failed to show that DMH had a duty to render mental healthcare or refer him to an outside mental health provider. And even assuming DMH or its providers should have referred him for mental healthcare, Plaintiff has not established a "reasonably close causal connection" between that breach and the resulting injury. As discussed at length above, any injuries Plaintiff sustained after he was discharged from the hospital were the result of his own self-harm after a failed escape attempt. DMH is therefore entitled to summary judgment on Plaintiff's negligence claim.[27]

---

[27] DMH also contends that there is no evidence of IIED. (ECF No. 102 at 24.) Plaintiff, however, did not bring a claim for IIED against DMH. (Compl. at 19) (alleging that DMH's deliberate indifference "also constitutes the torts of negligence and medical malpractice under the laws of Florida"). Notably, Plaintiff does not address this argument in his response to DMH's motion for summary judgment. (ECF No. 115.) To the extent his IIED claim arises from his IIED claim against Holmes County—which the Court previously dismissed—his claim would be untimely. *See supra* § IV.A.5; *see also* ECF Nos. 98, 125 (dismissing Plaintiff's IIED claim against Holmes County). Plaintiff's

### 3.    Compensatory and Punitive Damages

Finally, DMH argues that Plaintiff is not entitled to compensatory or punitive damages. As discussed above, there is absolutely no evidence that Plaintiff suffered any type of physical injury from DMH's actions or inactions. Self-inflicted wounds several weeks later following a failed escape attempt cannot be attributable to DMH. Accordingly, even assuming Plaintiff's claims against DMH did not fail for the reasons discussed above, Plaintiff is not entitled to compensatory or punitive damages. DMH's motion for summary judgment should therefore be granted.

## V.  PLAINTIFF'S STATUS

Plaintiff's last filings in this case were on April 19, 2017, in response to Defendants' motions for summary judgment. (ECF Nos. 115–19.) On June 19, 2017, the parties began receiving notices of inability to serve filings on Plaintiff because Plaintiff was unable to receive mail. (ECF Nos. 123, 127–28.) Then on December 27, 2017, the Court's order adopting the report and recommendation pertaining to DMH's motion to dismiss was returned as undeliverable with the notation "return to sender, ref[used],

---

IIED claim against DMH would also fail on the merits because no reasonable jury would find Dr. Welch, Nurse Frost, or DMH's behavior to be atrocious and utterly intolerable.

can't sign." (ECF No. 126.)[28]

On January 4, 2018, Defendants filed a notice advising the Court that Plaintiff had been transferred to Reception and Medical Center ("RMC") and that the warden at RMC informed counsel that "[d]ue to Mr. Morrill's medical state we advise that you contact his next of kin or power of attorney." (ECF No. 127 at 3.) The Court thereafter issued an order directing Plaintiff to advise the Court on or before February 5, 2018, whether he is able to participate in this case. (ECF No. 128.) The Court noted that if Plaintiff failed to respond it would consider holding the case in abeyance pending further information on Plaintiff's ability and competence to participate. (*Id.*)

As of the date of this report and recommendation Plaintiff has not yet responded. Plaintiff's medical condition and his ability and competence to participate in this case remain unknown. Therefore, in the event that Plaintiff does not respond by February 5, 2018, it is recommended that the Court consider holding this case in abeyance pending further information on Plaintiff's ability and competence to participate.

---

[28] To be clear, although Plaintiff did not file objections to the Court's report and recommendations recommending that DMH and Holmes County's motions to dismiss should be granted in part and denied in part, he did submit filings in this case after the time to file objections had expired. Thus, this does not appear to be a case in which he did not receive and/or could not respond to the report and recommendations.

## VI.  RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that:

1.     Defendant Doctors Memorial Hospital's Motion for Summary Judgment, ECF No. 102, should be **GRANTED**.

2.     Defendant Tim Brown's Motion for Summary Judgment, ECF No. 104, should be **GRANTED**.

3.     Defendant Lynn Lee's Motion for Summary Judgment, ECF No. 105, should be **GRANTED**.

4.     Defendant Raina Brown's Motion for Summary Judgment, ECF No. 106, should be **GRANTED**.

5.     Defendant Holmes County, Florida's Motion for Summary Judgment, ECF No. 107, should be **GRANTED**.


 **IN CHAMBERS** at Gainesville, Florida, this 30th day of January 2018.


*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge


## NOTICE TO THE PARTIES


**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**